NORTH ARLINGTON MEDICAL BUILDING INC., JOHN W. ISBELL AND NORMA D. ISBELL, APPELLANTS, *v.* SANCHEZ CONSTRUCTION COMPANY, RESPONDENT.

No. 5994

June 24, 1970                              471 P.2d 240

*Hawkins, Rhodes & Hawkins,* and *F. DeArmond Sharp,* of Reno, for Appellants.

*John Sanchez,* of Reno, for Respondent.

## OPINION

By the Court, BATJER, J.:

This appeal is from a joint and several judgment entered against two officers and directors and the corporation, resulting from a conclusion by the trial court that the corporation was their alter ego.

In the month of September, 1961, Vogue Properties, Inc., purchased a parcel of property located at 674 North Arlington Street, Reno, Nevada, from Robert and Wallace Byassee. Part of the purchase price was a note for $12,000 made by Vogue, which was secured by a first deed of trust on the property. On July 31, 1962, Sanchez Construction Company, hereinafter referred to as Sanchez, or the respondent, acquired the Arlington property from Vogue and assumed the Byassee note.

In October of 1962, Sanchez granted to Isbell Industries, Inc., a Nevada corporation, an option to purchase the Arlington property.

Isbell Industries exercised its option on January 14, 1963. On January 17, 1963, North Arlington Medical Building, a Nevada corporation, hereinafter referred to as North Arlington, as the nominee of Isbell Industries, entered into an escrow for the purchase of the Arlington property. On January 23, 1963, the property was conveyed by Sanchez to North Arlington. Sanchez received as the net proceeds of the sale the sum of $10,672.62.

North Arlington was officially incorporated on January 23, 1963. The first officers were John W. Isbell, President; John W. Isbell, Jr., Secretary; Norma D. Isbell, Vice-President and Treasurer. They were also the only directors.

On January 30, 1963, 71 shares of the capital stock of North Arlington were issued to Suzanne K. Isbell, and 71 shares to William Christopher Isbell, the minor children of John W. Isbell and Norma D. Isbell. William and Suzanne Isbell each paid $7,100 to North Arlington for their stock, but the shares of stock were not physically delivered to them. This money came from their savings accounts at Nevada Bank of Commerce, which were created by gifts to them from their parents.

John W. Isbell testified that North Arlington was originally conceived to be used to acquire the Arlington property for the purpose of the construction of a medical building as an investment for his minor children. As president he managed North Arlington, however, Norma D. Isbell never owned stock in North Arlington and did not participate in managing the corporation.

In order to construct a building on the real property, North Arlington obtained a construction loan from the Nevada Bank of Commerce in the amount of $102,000. That loan was secured by a deed of trust on the property to which the deed of trust securing the obligation owed to Robert and Wallace Byassee was subordinated. In addition, the Nevada Bank of Commerce required John W. Isbell to personally guarantee the loan.

The contract for the construction of a building on the Arlington property was let to Isbell Industries. John W. Isbell was the president of Isbell Industries. Glen Williams supervised the construction of the building on the Arlington property for Isbell Industries. During the course of construction, progress payments to Isbell Industries were handled by North Arlington through the Nevada Bank of Commerce.

About the time the building was being completed, and for a period of time thereafter, Isbell Industries advanced funds to North Arlington which were used to finish the building, pay taxes, and the interest on the construction loan. These advances created an account receivable on the books of Isbell Industries from North Arlington. John W. Isbell had advanced funds to North Arlington which it used to pay its debts. For these funds he received 61 shares of stock in North Arlington. On behalf of North Arlington, he also personally repaid to Isbell Industries the funds which it had advanced.

Unable to lease or sell the building, North Arlington defaulted on the note to Nevada Bank of Commerce. A notice of breach and election to sell under the deed of trust was recorded February 15, 1967. In due course, the foreclosure was completed. In the meantime, the note to Robert and Wallace Byassee lapsed into default, so they commenced an action against Vogue and Sanchez for the unpaid balance. Sanchez then filed a third party claim against North Arlington and John W. Isbell, Norma D. Isbell and John W. Isbell, Jr.,[1] alleging that the corporation had assumed the Byassee note when it acquired the North Arlington property from Sanchez Construction Company, and that the corporation was the alter ego of the individual defendants. Sanchez stipulated with Byassee that judgment could be entered against it in the amount of $9,611.73.

The third party complaint was tried before the district court, without a jury, upon the depositions appearing in the record. The trial court found John W. Isbell and Norma D. Isbell to be the alter ego of North Arlington and entered a joint and several judgment against all of them, and also allowed attorney fees and interest at the rate of 8 percent per annum on the judgment.

The appellants contend that the trial court erred in (1) concluding that North Arlington Medical Building, Inc., is the alter ego of John W. and Norma D. Isbell; (2) in allowing interest at the rate of 8 percent per annum, and (3) in allowing the respondent an attorney's fee.

We agree that the trial court erred when it found North Arlington to be the alter ego of John W. and Norma D. Isbell.

The respondent, Sanchez, argues that the evidence set forth in the deposition testimony supports the findings of the trial

---

[1]John W. Isbell, Jr., was never served with process, and never appeared in the action.

court. Here the trial court made no findings of fact, but instead only reached the conclusion that John W. and Norma D. Isbell were the alter ego of North Arlington. The failure to specifically find facts as required by NRCP 52(a)[2] can constitute reversible error. Lagrange Construction Inc. v. Del E. Webb Corp., 83 Nev. 524, 435 P.2d 515 (1967). Because this case was decided by the trial court on deposition testimony and exhibits, we have the same evidence before us that was reviewed by the trial court. Rather than reverse for failure to comply with NRCP 52(a), we have examined the evidence to determine whether or not the conclusions reached by the trial court were clearly wrong. Garaventa v. Gardella, 63 Nev. 304, 169 P.2d 540 (1946); Sisson v. Sisson, 77 Nev. 478, 367 P.2d 98 (1961); Finnell v. Bromberg, 79 Nev. 211, 381 P.2d 221 (1963); cf. Adams v. Lawson, 84 Nev. 687, 448 P.2d 695 (1968).

In Baer v. Amos J. Walker, Inc., 85 Nev. 219, 452 P.2d 916 (1969), we said: "The corporate cloak is not lightly thrown aside. Nevada Tax Comm'n v. Hicks, 73 Nev. 115, 310 P.2d 852 (1957). However, adherence to the fiction of a separate entity must not sanction a fraud or promote injustice." In McCleary Cattle Co. v. Sewell, 73 Nev. 279, 317 P.2d 957 (1957), this court adopted from Minifie v. Rowley, 202 P. 673 (Cal. 1921), the following requirements for the application of the alter ego doctrine: (1) The corporation must be influenced and governed by the person asserted to be its alter ego. (2) There must be such unity of interest and ownership that one is inseparable from the other. (3) The facts must be such that adherence to the fiction of separate entity would, under the circumstances, sanction a fraud or promote injustice.

Each of these requirements must be present before the alter

---

[2]NRCP 52(a): "In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon and direct the entry of the appropriate judgment; and in granting or refusing interlocutory injunctions the court shall similarly set forth the findings of fact and conclusions of law which constitute the grounds of its action. Requests for findings are not necessary for purposes of review. Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses. The findings of a master, to the extent that the court adopts them, shall be considered as the findings of the court. If an opinion or memorandum of decision is filed, it will be sufficient if the findings of fact and conclusions of law specifically appear as such therein. Findings of fact and conclusions of law are unnecessary on decisions of motions under Rules 12 or 56 or any other motion."

ego doctrine can be applied. Hollywood Cleaning & Press. Co. v. Hollywood L. Service, 17 P.2d 709 (Cal. 1932); Continental Securities and Investment Co. v. Rawson, 280 P. 954 (Cal. 1929); Minifie v. Rowley, supra; Erkenbrecher v. Grant, 200 P. 641 (Cal. 1921).

It is admitted that John W. Isbell, as president, completely influenced and managed North Arlington. On the other hand, Norma D. Isbell, as a nominal officer and director, had virtually no influence or control over that corporation. In no way did she govern it. She owned no stock; had no right to share in any of the profits; nor was she paid a salary or any other remuneration. There was absolutely no unity of interest or ownership between Norma and North Arlington. She was not the alter ego of the corporation. Riddle v. Leuschner, 335 P.2d 107 (Cal. 1959).

Although John W. Isbell influenced and governed North Arlington, there is no such unity of interest and ownership between him and the corporation that their identities are inseparable.

At the outset, when North Arlington was formed and Sanchez conveyed the real property to the corporation, all the stock was owned by William Christopher Isbell and Suzanne K. Isbell. The corporation was organized as an investment for them. The funds used to pay for the stock were withdrawn from bank accounts previously created by accumulated gifts. It must be presumed that the sums deposited in the bank accounts for the minor children were gifts that became their sole and separate property. Cf. NRS 167.040. The burden was on Sanchez to establish by certain and convincing evidence that the sums were not perfected gifts, but remained instead the property of John W. Isbell. This Sanchez has failed to do. The fact that John W. Isbell was able to withdraw these sums and purchase North Arlington stock is not sufficient to divest the minor children of ownership. Fister v. Fister, 222 P.2d 620 (Colo. 1950); Steiner v. Lawson, 219 N.E.2d 121, (Ill.App. 1966); Kelsey v. Anderson, 421 P.2d 163 (Wyo. 1966).

The respondent contends that a valid reason for envoking the doctrine of alter ego was because North Arlington was undercapitalized. Rosen v. Losch, Inc., 44 Cal.Rptr. 377 (Cal.App. 1965).

Undercapitalization, where it is clearly shown, is an important factor in determining whether the doctrine of alter ego should be applied. However, in the absence of fraud or injustice to the aggrieved party, it is not an absolute ground for disregarding a corporate entity. In any event it is incumbent upon the one seeking to pierce the corporate veil, to show by a preponderance of the evidence, that the financial setup of the corporation is only a sham and caused an injustice. Carlesimo v. Schwebel, 197 P.2d 167 (Cal.App. 1948); Arnold v. Phillips, 117 F.2d 497 (CA 5 Tex. 1941); Hanson v. Bradley, 10 N.E.2d 259 (Mass. 1937); cf. Tropic Builders Ltd. v. Naval Ammunition Depot, 402 P.2d 440 (Hawaii 1965).

Here, Sanchez attempts to infer from the ultimate result that North Arlington was inadequately financed. However, the record is devoid of evidence going to show this to be true, and more important the respondent failed to show any causal connection between the financing and the inability to pay the Byassee note, or how it sanctioned a fraud or promoted an injustice.

The respondent further contends that because stock certificates were "written up" but not delivered, and formal meetings were not held, that the trial court properly pierced the corporate veil.[3] These contentions may be factors to be considered

---

[3] 8 ALR3d 1130, footnote 2: "In Associated Vendors, Inc. v. Oakland Meat Co. (1962) 210 Cal App 2d 825, 26 Cal Rptr 806, the court included a list of factors, with supporting cases, mentioned by the courts in determining whether or not to disregard the corporate entity. The factors listed were as follows: commingling of funds and other assets, failure to segregate funds of the separate entities, and the unauthorized diversion of corporate funds or assets to other than corporate uses; the treatment by an individual of the assets of the corporation as his own; the failure to obtain authority to issue stock, or to subscribe to or issue stock; the holding out by an individual that he is personally liable for the debts of the corporation; the failure to maintain minutes or adequate corporate records, and the confusion of the records of the separate entities; identical equitable ownership in the two entities; the identification of the equitable owners thereof with the domination and control of the two entities; identification of the directors and officers of the two entities in the responsible supervision and management; sole ownership of all of the stock in a corporation by one individual or the members of a family; the use of the same office or business location; the employment of the same employees and/or attorney; the failure to capitalize a corporation adequately; the total absence of corporate assets, and undercapitalization; the use of the corporation as a mere

by a trial court, however, the record here does not reveal in what manner they sanctioned a fraud or promoted an injustice towards the respondent.

Although, the sale of the real property to North Arlington resulted in a very unprofitable venture for Sanchez, we find nothing in the record that would indicate that adherence to the fiction of the separate entity of North Arlington would sanction a fraud or promote injustice. The requirements of McCleary Cattle Co. v. Sewell, supra, have not been met. The trial court reached an erroneous conclusion when it found the North Arlington Medical Building, Inc., to be the alter ego of John W. Isbell and Norma D. Isbell.

■■■■■

The respondent admits that it was error for the trial court to allow interest in the amount of 8 percent per annum on the judgment and consents that it be reduced to the amount allowed by statute. We find no merit in the appellants' contention that the trial court erred in allowing the respondent an attorney's fee.

The judgment is reversed as it pertains to John W. Isbell and Norma D. Isbell. The judgment against North Arlington Medical Building, Inc., is affirmed, save and except the award of interest which is reduced from 8 percent to 7 percent per annum.

COLLINS, C. J., ZENOFF, MOWBRAY, and THOMPSON, JJ., concur.

---

shell, instrumentality, or conduit for a single venture or the business of an individual or another corporation; the concealment and misrepresentation of the identity of the responsible ownership, management, and financial interest, or concealment of personal business activities; the disregard of legal formalities and the failure to maintain arm's length relationships among related entities; the use of the corporate entity to procure labor, services, or merchandise for another person or entity; the diversion of assets from a corporation by or to a stockholder or other person or entity, to the detriment of creditors, or the manipulation of assets and liabilities in another; the contracting with another with intent to avoid performance by use of a corporate entity as a shield against personal liability, or the use of a corporation as a subterfuge in illegal transactions; and the formation and use of a corporation to transfer to it the existing liability of another person or entity."