In the Matter of TWIN LAKES
VILLAGE, INC., Bankrupt.

In the Matter of Charles M. HEERS and
Marilyn E. Heers, Debtors.

In the Matter of Carol D. HEERS and
Evelyn M. Heers, Debtors.

Bankruptcy Nos. 4151, 4245 and 4246.

United States Bankruptcy Court,
D. Nevada.

Jan. 22, 1980.

**534**

Harold Slane, Jr., of Slane, Slane & Lane, City of Commerce, Cal., and Jack G. Perry, of Perry & Clary, Las Vegas, Nev., for claimant.

Louis Wiener, Jr., of Wiener, Goldwater, Waldman & Gordon, Las Vegas, Nev., for debtors, Charles M. and Marilyn E. Heers, and co-counsel for debtor, Twin Lakes Village, Inc.

Melvin D. Close, Jr., of Jones, Jones, Bell, Close & Brown, Las Vegas, Nev., for debtors, Carol D. Heers and Evelyn M. Heers, and co-counsel for debtor, Twin Lakes Village, Inc.

## MEMORANDUM OPINION

LLOYD D. GEORGE, Bankruptcy Chief Judge.

Some time ago, this matter came before the Court in the form of debtors' objections to certain claims filed by PCK of Sacramento, Inc. (hereinafter referred to as "PCK"), in each of the above-entitled proceedings. As substantiation for its claims, PCK had initially noted in its proof of claim filings a judgment dated May 31, 1967, entered in Case No. A 11885 in the Eighth Judicial District Court of the State of Nevada. Subsequently, amended proofs of claim were filed, appended to which were conformed copies of a judgment signed by Eighth Judicial District Judge John F. Mendoza, in the previously noted Case No. A 11885. Significant for the purposes of the instant proceeding, however, is the fact that said Case No. A 11885 had been entitled "P.C.K. of SACRAMENTO, INC., a corporation, Plaintiff, vs. HEERS BROTHERS, INC., a corporation, Defendant." In order to explain the relevancy of this judgment to the Debtors then before the Court, PCK further attached an "Exhibit 'A' " to each proof of claim, stating that

"The basis for the claim is as follows:
"PCK of SACRAMENTO, INC. obtained a Judgment against HEERS BROTHERS, INC. in May of 1967. Said Judgment has become final.
"The basis of the claim against the Petitioner is as follows:
1. The Petitioner is the alter ego of the Judgment Debtor.
2. That the Petitioner is indebted to the Judgment Debtor, Heers Brothers, Inc.
3. That the Petitioner is in receipt of property beloning [sic] to the Judgment Debtor in violation of the Uniform Fraudulent Conveyance Act."

During the interim period between the filing of the original and the amended proofs of claim, PCK brought on applications to have receivers appointed in each of these proceedings. In response to these applications, counsel for Twin Lakes Village, Inc. then filed a petition asking for the discharge of that debtor and, later, an objection to the allowance of the claim of PCK against Twin Lakes. In a hearing held concerning this objection on May 7, 1971, the Court took the oral arguments of

counsel under advisement, requesting that subsequent briefs be filed with respect to this objection. On July 27, 1971, Bankruptcy Judge Russell B. Taylor found that the Court had no jurisdiction to hear the claim against Twin Lakes Village, Inc., since the original judgment debtor of PCK, Heers Brothers, Inc., was not before the Court and could not be brought involuntarily before the summary jurisdiction of the Court. Therefore, without any further trial on the matter, Judge Taylor ordered the dismissal of the claim of PCK against Twin Lakes Village, Inc. and of the entire Chapter XI proceeding of the latter-named debtor.

Thereafter, the individual Heers also petitioned for discharge on the same grounds as had Twin Lakes, having their proceedings also dismissed by Judge Taylor, on March 19, 1973. No distinct objection was made at that time, however, to the PCK claims in the Heers' proceedings. Meanwhile, PCK had appealed the Twin Lakes decision to the United States District Court, which affirmed Judge Taylor's orders on November 2, 1973, and then to the United States Court of Appeals for the Ninth Circuit. In a similar fashion, the dismissals of the individual Heers proceedings were appealed to the District Court, which instead chose to send these proceedings back to Judge Taylor for a specific finding as to the validity of PCK's claims against the estates of the Heers, as individuals. Finally, on January 23, 1975, the Ninth Circuit Court of Appeals vacated the orders of Judge Taylor in the Twin Lakes proceeding and requested that a more detailed analysis of his jurisdictional findings and conclusions be set forth, and that the bankruptcy court determine whether PCK had been given a fair hearing on their reply to the petition and objection of the then debtor-in-possession.

Pursuant to the orders of the District Court in the Heers cases, and of the Ninth Circuit Court of Appeals in the Twin Lakes matter, this Court scheduled a full evidentiary hearing on all of the questions raised by these parties. Following a number of continuances, such a hearing took place on June 5–6, 1978. After assessing the testimony there adduced, and examining the relevant law on each of the issues thus raised, the Court has no choice but to deny the claims of PCK in each of these proceedings. Inasmuch as a number of factors have intervened in these cases, however, to render the earlier questions raised by these parties concerning discharge or dismissal immaterial to present realities, the Court now withholds its determination on those matters. It should also be noted, in passing, that Twin Lakes Village, Inc. has since been adjudicated a bankrupt in its proceeding, no objection having been filed against its motion in that regard.

■ In first addressing the legal issues raised by the Ninth Circuit Court of Appeals in the Twin Lakes case, the Court observes that at this point in time there can be no doubt but that PCK has had a full opportunity to present its position on the asserted validity of its claims. However, with respect to the jurisdictional issue originally raised by the Debtors, the Court is inclined to rethink its position and to find that it is well within its summary powers to make a decision as to the obligations, if any, owing from the Debtors to PCK. This question is presented, factually, as a claim by PCK against the estates of debtors in proceedings under Chapter XI of the Bankruptcy Act. Section 2a(2) of that Act, 11 U.S.C. § 11a(2) (1976), as applied to Chapter XI proceedings by Section 312, 11 U.S.C. § 712 (1976), clearly permits the Court to "[a]llow claims, disallow claims, reconsider allowed or disallowed claims, and allow or disallow them against [debtors'] estates." Furthermore, since claims against an estate are in the nature of proceedings brought only as to property in the present or eventual possession of the debtor-in-possession, or its receiver, they are not subject to the jurisdictionally disabling language of Bankruptcy Act Section 23b, 11 U.S.C. § 46b (1976). No matter what grounds may be asserted by PCK to demonstrate that the acknowledged judgment obligation owing from Heers Brothers, Inc. forms a possible claim against the Debtors' estates, the ultimate question still involves the provability and/or allowability of claims in proceedings

before this Court. The Court may therefore hear the matter to the extent that it deals with obligations existing between this Claimant and these Debtors.

Prior to examining each of the bases listed by PCK in support of its claims herein, however, it should be observed that at the time of hearing, Counsel for the Debtors introduced documentation to show that some $8,000 of the alleged $118,000 claim of PCK had been assigned to a third party, M.A. Cornell & Co. This entity has never filed a proof of claim in these proceedings. It was the holding of the Court then that since that alleged creditor was not before the Court, no validity could attach to that portion of PCK's original claim. The Debtors' objection was therefore sustained as to that amount. The Court sees no reason at this point to alter that determination. Hence, the Court's analysis of the Claimant's position will only relate to $110,000 of the amount demanded.

■ Taking first the claim of PCK that the Debtors are obligated to Heers Brothers, Inc., and that it may therefore assert against them the judgment debt owing it from the latter corporate entity, the Court finds the lack of both a legal and a factual foundation to support the Claimant's right to recovery in this forum. At best, the evidence elicited at trial on this question was sketchy. From some such proof, the Court might surmise that certain amounts were both loaned and given to, or on behalf of, the individual Heers family members. There is also evidence that the Heers individuals and Twin Lakes Village, Inc. were the beneficiaries of a settlement agreement involving Loma Linda University which disposed of certain real properties originally belonging to Heers Brothers, Inc. The only evidence given as to the existence of the loans mentioned, however, was in the form of entries made in a ledger for Heers Brothers, Inc., covering the years 1963–64. Account number 234 in that ledger, Claimant's Exhibit # 1, is entitled "Loans to Officers." It contains a number of entries dating from January 31, 1963 through December 31, 1964, which evidence the cre-

ation of a balance on such loans of $169,-063.40. Thereafter, this amount was journaled out, with reference being made to a journal entry number 18–2, which covers salaries paid to officers, $39,000 of which seems to represent a forgiveness of indebtedness to such officers on account number 234. A second reference is made to journal entry number 18–3, which appears to create a forgiveness amounting to the remaining $130,063.40 balance found in the "Loans to Officers" account, predicated upon a certain transfer of land, on which the $130,063.40 was part of the consideration paid. Beyond this brief sketch of the transactions involving these sums, however, the Court is without guidance to determine to whom these loans were made, or whether any amount might remain as a debt owing from any of the Debtors herein to Heers Brothers, Inc.

Two other accounts, numbered 1310 and 1310–A and named, respectively, "current a/c w/ affiliates" and "Current Account with Affiliated Companies (Home Office)," note some sort of obligations owing to Heers Brothers, Inc. from "affiliated companies," but fail to name the companies to which they refer. Neither these nor the "Loans to Officers" entries serve as adequate proof, by themselves, that funds were owed by the present Debtors to Heers Brothers, Inc. at the time they entered into these proceedings in 1968. Other entries in this ledger, and in other accounting sheets admitted into evidence, do show what appear to be transfers from Heers Brothers, Inc. to the Debtors. Nowhere, however, does the Court find proof that these transfers were meant to give rise to enforceable debt obligations owing from these Debtors to PCK's judgment obligee. And, Counsel has supplied the Court with no legal or equitable grounds upon which it can now create obligations based upon the facts here presented.

■ Even if these Debtors could be shown to have owed financial duties to Heers Brothers, Inc., however, the Court doubts that it would be able to allow that the claims of PCK be satisfied from the Debtors' respective estates, based solely

upon the quasi-garnishment theories propounded by Counsel for the Claimant. Before any proof of claim can be examined and the claim represented by it proved and allowed, it must be set forth in accordance with the form and content requirements of Bankruptcy Rule 301(a) and be executed "by the creditor or his authorized agent." By statutory definition, a " '[c]reditor' shall include anyone who *owns* a debt, demand, or claim provable in bankruptcy, and may include his duly authorized agent, attorney, or proxy . . . ." 11 U.S.C. § 1(11) (1976) (emphasis supplied). No explanation of the term "owns" can be found by the Court, though it does seem to designate the existence of a present interest in an obligation or chose in action. Moreover, the "shall include" language of this section would not preclude the entertainment of a great number of obligations not commonly contemplated by the terms "debt," "demand," or "claim." 1 Collier on Bankruptcy ¶ 1.11, at 76–77 (14th ed. 1968).

Still, at the time these Debtors entered the present proceedings, it is undeniable that no enforceable obligation, either by judgment or through agreement, was owed by them to PCK. The concept of garnishment is purely statutory in its nature and origins. *Hoyt v. Paysee*, 51 Nev. 114, 269 P. 607 (1928); *McKelvey v. Crockett*, 18 Nev. 238, 2 P. 386 (1884). In Nevada, the garnishment statutes require that a number of procedural steps be completed and, in fact, that an ancillary judgment be entered against the garnishee, before a debt owed by the latter to one creditor may be enforced by a second party asserting a claim against that creditor. *See* N.R.S. 31.-240, *et seq.*, particularly N.R.S. 31.300 (1973). Such statutory requisites as these have, in recent years, been strictly construed and enforced by the Nevada courts.

*See, e. g., Fisher Bros., Inc. v. Harrah Realty Co.*, 92 Nev. 65, 545 P.2d 203 (1976), *overruling, sub silentio, Peccole v. Luce & Goodfellow*, 66 Nev. 360, 212 P.2d 718 (1949). Absent a showing of plain compliance with the garnishment provisions of the Nevada Revised Statutes, PCK can make no garnishment debt claim, in its own behalf, against these alleged debtors of Heers Brothers, Inc.

Perhaps recognizing its inability to make such a demonstration, the Claimant has instead relied upon a somewhat obscure procedural device, made available in Nevada by virtue of N.R.S. 21.330, which allegedly permits a direct suit to be filed by a judgment creditor against an obligee of the judgment debtor.[1] Being remedial in nature, like the Nevada garnishment provisions, however, this section does not *create* any new debt obligations as to debtors of a defeated litigant, who were not themselves part of the original action. It is a post-judgment collection mechanism, alien to federal bankruptcy procedures, which must again be strictly followed before any enforceable obligation will be recognized. In the instant case, no effort has been made to obtain the required order authorizing an action to be entered under N.R.S. 21.330, let alone to carry that action forward to the obtaining of an enforceable judgment. Only the present proofs of claim have been filed. This is not sufficient to establish the "ownership" of a debt obligation by PCK against Twin Lakes Village, Inc., or any of the Heers debtors. *See generally Cann v. Williams Land & Livestock Co.*, 56 Nev. 242, 48 P.2d 887 (1935). This Court is therefore unable to allow these claims on the basis of any ostensible amounts owing from the debtors herein to Heers Brothers, Inc.

---

1. N.R.S. 21.330 provides:

"If it appears that a person or corporation alleged to have property of the judgment debtor, or indebted to him, claims an interest in the property adverse to him, or denies the debt, the court or judge may authorize, by an order made to that effect, the judgment creditor to institute an action against such person or corporation for the recovery of such interest or debt; and the court or judge may, by order, forbid a transfer or other disposition of such interest or debt until an action can be commenced and prosecuted to judgment. Such order may be modified or vacated by the judge granting the same, or the court in which the action is brought, at any time, upon such terms as may be just."

Moving on to the fraudulent conveyance claim of PCK, the Claimant candidly acknowledges the inadequacy of its position under the existing provisions of Nevada's version of the Uniform Fraudulent Conveyance Act. N.R.S. 112.010, *et seq.* (1973). To be sure, the evidence adduced by Counsel for PCK does prove that in a number of instances funds were transferred by Heers Brothers, Inc. to the Heers individuals. Counsel has not, however, laid out the extent of these transfers, nor has he gone to the trouble of tying these conveyances to the statutory requisites of the Uniform Fraudulent Conveyance Act. No clear and convincing showing of fraud has been made so as to satisfy N.R.S. 112.080. Proof as to the solvency of Heers Brothers, Inc. at the time of these transfers has not been forthcoming, so as to bring into effect either N.R.S. 112.050 or N.R.S. 112.060. And, no effort was extended toward establishing the intent of the parties herein, or of any other acting officers of Heers Brothers, Inc., at the time these conveyances took place. See N.R.S. 112.070 (1973).

Moreover, the remedy sought by PCK, that of a monetary recovery on their judgment, does not comport with the only remedies provided by this act, i. e., the recovery of, or the right to attach and execute upon the property actually transferred. N.R.S. 112.100–.110 (1976). Nevertheless, Counsel notes that N.R.S. 112.120 further allows that

> "[i]n any case not provided for in this chapter the rules of law and equity including the law merchant, and in particular the rules relating to the law of principal and agent, and the effect of fraud, misrepresentation, duress or coercion, mistake, bankruptcy or other invalidating cause shall govern."

From this language, Counsel maintains that the Court should formulate an equitable remedy, paralleling the Uniform Fraudulent Conveyance Act as to its transfer elements, which would permit the monetary recovery sought, but without placing so stringent a burden of proof upon the Claimant as does this act. In reality, what Counsel appears to be requesting, judging from the evidence presented at trial, is that the Court provide a remedy allowing a judgment creditor to receive a recovery from any transferee from his judgment debtor, who has not given value for said transfer, so long as it can be established that the latter two were so interrelated as to raise a presumption of fraud. Unfortunately, the Court has not been shown, nor has it been able to uncover on its own any recognized legal or equitable principle to support such a presumption or recovery, other than the Claimant's own primary remedial theory, the alter ego doctrine.

This latter doctrine, as it is applied in Nevada, is of highly questionable parentage. It first appeared in this state as a dictum in the 1957 case of *Nevada Tax Commission v. Hicks*, 73 Nev. 115, 310 P.2d 852 (1957), where the court refused to pierce a corporate form to merge its activities with those of an associated partnership and of a corporate officer and controlling shareholder. Nevertheless, recognition was made by the court that "[i]n a proper case the theory [of limited shareholder liability] is disregarded when it serves as a shield against [in]justice." *Id.* at 130, 310 P.2d at 859. No delineation was drawn, however, as to what might constitute a "proper case" for sidestepping corporate formalities, other than a limited allusion being made to the need for the existence of "operational control" of the corporate organization by another person or corporation; something more than "a mere financial investment" by one entity in the other. *Id.*

Nevertheless, that same year the Nevada Supreme Court did encounter a fact situation which justified the piercing of a corporate veil. In *McCleary Cattle Co. v. Sewell*, 73 Nev. 279, 317 P.2d 957 (1957), one group of shareholders maintained such a unified control over two technically separate corporations as to permit the unquestioned and uncompensated transfer of the total assets of one to the other, much to the detriment of the creditors of the first corporate entity. The court therefore found the trial court to be "justified in disregarding the corporate fiction" and in holding the transferee corporation liable for the debts of its transferor.

Although the shareholders argued that the maneuver had been undertaken solely for tax purposes, the court observed that "[i]t is not necessary that the plaintiff prove actual fraud. It is enough if the recognition of the two entities as separate would result in an injustice." *Id.* at 282, 317 P.2d at 959, *citing Gordon v. Aztec Brewing Company*, 33 Cal.2d 514, 522, 203 P.2d 522, 527 (1949). Rather than requiring proof of fraudulent intent, the court set forth a three-point test, adapted from the two-prong rule used in the landmark California alter ego case of *Minifie v. Rowley*, 187 Cal. 481, 202 P. 673 (1921), for judging the appropriateness of ignoring corporate formalities:

> "(1) The corporation must be influenced and governed by the person asserted to be its alter ego. (2) There must be such unity of interest and ownership that one is inseparable from the other; and (3) The facts must be such that adherence to the fiction of separate entity would, under the circumstances, sanction a fraud or promote injustice."

*Id.*

One major difficulty which has developed with this test, however, is that it lends itself over to descriptive, rather than causational, analysis. Thus, later Nevada cases have tended to speak in terms as would indicate the use of a "checklist" approach to determining an alter ego situation. *See, e. g., Bonanza Hotel Gift Shop, Inc. v. Bonanza No. 2*, Nev., 596 P.2d 226 (1979); *Lipshie v. Tracy Investment Co.*, 93 Nev. 370, 566 P.2d 819 (1977); *Carson Meadows, Inc. v. Pease*, 91 Nev. 187, 533 P.2d 458 (1975); *North Arlington Medical Building, Inc. v. Sanchez Constr. Co.*, 86 Nev. 515, 471 P.2d 240 (1970). And, in fact, the 1970 *North Arlington* case openly adopts the list of "relevant" factors employed by a California appellate court in *Associated Vendors, Inc. v. Oakland Meat Co.*, 210 Cal.App.2d 825, 26 Cal.Rptr. 806 (1962) as one means of determining the applicability of the alter ego doctrine established by the *Minifie* case:

> "The factors listed were as follows: commingling of funds and other assets, failure to segregate funds of the separate entities, and the unauthorized diversion of corporate funds or assets to other than corporate uses; the treatment by an individual of the assets of the corporation as his own; the failure to obtain authority to issue stock, or to subscribe to or issue stock; the holding out by an individual that he is personally liable for the debts of the corporation; the failure to maintain minutes or adequate corporate records, and the confusion of the records of the separate entities; identical equitable ownership in the two entities; the identification of the equitable owners thereof with the domination and control of the two entities; identification of the directors and officers of the two entities in the responsible supervision and management; sole ownership of all of the stock in a corporation by one individual or the members of a family; the use of the same office or business location; the employment of the same employees and/or attorney; the failure to capitalize a corporation adequately; the total absence of corporate assets, and undercapitalization; the use of the corporation as a mere shell, instrumentality, or conduit for a single venture or the business of an individual or another corporation; the concealment and misrepresentation of the identity of the responsible ownership, management, and financial interest, or concealment of personal business activities; the disregard of legal formalities and the failure to maintain arm's length relationships among related entities; the use of the corporate entity to procure labor, services, or merchandise for another person or entity; the diversion of assets from a corporation by or to a stockholder or other person or entity, to the detriment of creditors, or the manipulation of assets and liabilities in another; the contracting with another with intent to avoid performance by use of a corporate entity as a shield against personal liability, or the use of a corporation as a subterfuge in illegal transactions; and the formation and use of a corporation to transfer to it the existing liability of another person or entity."

*North Arlington Medical Building, Inc. v. Sanchez Constr. Co., supra* 86 Nev. at 522–23 n. 3, 471 P.2d at 244–45 n. 3, *citing* Annot., 8 A.L.R.3d 1122, 1130 n. 2 (1972).

One logical difficulty with using such an undifferentiated listing is that subsequent courts have no way of knowing how to weigh each of the factors found in the evidence elicited in the case at hand. Rather, each court usually surmises that there must exist some standard "profile" of an alter ego situation. It is then hoped that this profile can be ferreted from the existing published case opinions applying the checklist method. Unfortunately, the paucity of such cases often leaves the court to make a determination in largely an ad hoc manner. *But see H.A.S. Loan Service, Inc. v. McColgan*, 21 Cal.2d 518, 133 P.2d 391 (1943) (favoring a case-by-case approach).

In Nevada, a second factor also renders the checklist approach less than satisfactory. Article 8, Section 3 of the Nevada Constitution mandates that

"[d]ues from corporations shall be secured by such means as may be prescribed by law; Provided, that corporators in corporations formed under the laws of this State shall not be individually liable for the debts or liabilities of such corporation."

One commentator has persuasively interpreted this provision as limiting the control of the legislature and the courts over shareholder liability to matters involving the creation and initial capitalization of corporate entities. Belford, "The Decline and Fall of Stockholders' Limited Liability in Nevada," 40 Inter Alia 3 (July 1975), *citing Seaborn v. Wingfield*, 56 Nev. 260, 48 P.2d 881 (1935) (declaring unconstitutional a Nevada statute imposing liability on bank shareholders beyond their initial stated capital investment); *Thompson v. Reno Sav. Bank*, 19 Nev. 103, 7 P. 68 (1885) (requiring, however, that the capital stock be properly paid and maintained as a trust fund for the benefit of the corporation's general creditors).

 Further restricting judicial prerogatives in this area is the traditional hesitance exhibited by the Nevada courts to practice what might be construed as "judicial legislation." *See, e. g., Board of School Trustees v. Bray*, 60 Nev. 345, 109 P.2d 274 (1941); *Grant v. Payne*, 60 Nev. 250, 107 P.2d 307 (1940); *Fredrickson & Watson Constr. Co. v. Boyd*, 60 Nev. 117, 102 P.2d 627 (1940); *Seaborn v. First Judicial Dist. Court*, 55 Nev. 206, 29 P.2d 500 (1934); *Heywood v. Nye County*, 36 Nev. 568, 137 P. 515 (1913); *State ex rel. Mighels v. Eggers*, 36 Nev. 364, 136 P. 104 (1913). "Thus, where the legislature has spoken with imperfect clarity or has failed to speak at all, it is still the function of the court not to 'will' the law, but to discern it . . . ." *Goodman v. Goodman*, 68 Nev. 484, 488, 236 P.2d 305, 307 (1951). Inasmuch as the Nevada legislature has seen fit to promulgate extensive and detailed laws governing the creation and capitalization of corporations, including provisions permitting obligations to be incurred before full capitalization has occurred,[2] the Nevada courts would seem-

---

**2.** Although *undercapitalization is widely accepted as a principal ground for piercing a corporate form, see North Arlington Medical Building, Inc. v. Sanchez Constr. Co., supra* 86 Nev. at 522, 471 P. 2d at 244—45; Annot. 63 A.L.R.2d 1051 (1959), its use as a determinative factor has not gone without considerable criticism. One author has observed, in discussing its employment as a totally dispositive factor in alter ego findings, that the fact that

"a greater number of jurisdictions have not established inadequate capitalization alone as a ground for unlimited entrepreneur liability is perhaps explained by three considerations: (1) fear that hindsight would play too dominant a role in determining adequacy of capital; (2) difficulties apparent in formulating a workable mathematical ratio of capital to debt or to business volume; and (3) feeling in some quarters that, in view of the stated relationship of the legislature and the judiciary, compliance with minimum statutory capitalization standards should be decisive in establishing limited liability.

Note, 56 Mich.L.Rev. 299, 300 (1957). No direct statutory standard has been set in Nevada for the adequate capitalization of any corporation. The capitalization reporting requirements of N.R.S. 78.035(4) are only for the purpose of giving notice to potential creditors as to the initial capitalization of the corporate enterprise; that is to say, the extent of the liability assumed by capital shareholders. *See Thompson v. Reno Sav. Bank*, 19 Nev. 103, 7 P. 68 (1885); *Llewellyn Iron Works v. Abbott Kinney*

ingly be prone to abstain from basing corporate piercing attempts on irregularities in corporate operation not falling to the level of being violative of such legislation. Nevertheless, on several occasions, the Nevada Supreme Court has defined possible alter ego circumstances, in part, by conduct which had been left relatively unrestrained by the Nevada legislature. *See, e. g., North Arlington Medical Building, Inc. v. Sanchez Constr. Co., supra* 86 Nev. at 522, 471 P.2d at 244–45 (failure to deliver stock certificates and to hold formal meetings); *Carson Meadows, Inc. v. Pease, supra* 91 Nev. at 191, 533 P.2d at 460–61 ("[l]egal procedures *normally* incident to the operation of a corporation do not appear to have been honored at all." (Emphasis supplied). Such ignored "legal" procedures included meetings by directors to conduct corporation's business affairs and the keeping of corporate minutes); *Lipshie v. Tracy Investment Co., supra* 93 Nev. at 376, 566 P.2d at 823 (distinguishing fact situation of case from that found in *Chatterly v. Omnico, Inc.*, 26 Utah 2d 88, 485 P.3d 667 (1971), where the subsidiary of an alleged alter ego "neither kept nor maintained minutes, books or other general corporate records of its own"); *Bonanza Hotel Gift Shop, Inc. v. Bonanza No. 2, supra*, 596 P.2d at 230 (parent corporation found not to be alter ego of subsidiary where "separate corporate books and accounts were kept. Separate directors' meetings were held, and minutes recorded, with full corporate formalities observed. The corporations had independent headquarters, separate business responsibilities and operations. There was no showing that the parent companies had in any way im-

paired the assets of the company with which appellants had dealt."). Moreover, the Nevada high court has not even tended to examine such acts in light of the possible restrictions placed by articles of incorporation or corporate bylaws.[3] The only real "sin" ostensibly perpetrated by such apparent alter egos is that they fail to conform their activities to what would *normally* be expected of a "legitimate" corporation.

Even given the need for independent and efficiently managed corporations, therefore, the question must be asked as to why a corporate entity, having satisfied all of the statutory prerequisites necessary to its legal existence, should be ignored for its simple failure to operate up to more elevated norms set by a judiciary admittedly unempowered to create new laws in this area. The answer to such a query must, in this Court's mind, be found in three ancient equitable doctrines, including, principally, that of equitable estoppel. Although imperfectly stated in the above-cited cases, the Court finds in each a thread of this latter doctrine which at times weaves itself into a ground in itself to acknowledge or ignore a possible alter ego set of circumstances. The doctrine is, for example, partially encapsulated in the third element of the *McCleary* test, which the Nevada Supreme Court specifically found unproven in the above-mentioned *North Arlington* and *Lipshie* cases, and in *Ecklund v. Nevada Wholesale Lumber Co.*, 93 Nev. 196, 562 P.2d 479 (1977), *Plotkin v. National Lead Co.*, 87 Nev. 51, 482 P.2d 323 (1971), and *Baer v. Amos J. Walker, Inc.*, 85 Nev. 219, 452 P.2d 916 (1969). It is apparent from

---

*Co.*, 172 Cal. 210, 155 P. 986 (1916). And, in fact, no actual capitalization need take place before a corporation enters its corporate "existence" so as to do business within this state and accrue corporate obligations. *See* N.R.S. 78.-050–.070 (1977).

**3.** It is doubtful that the third-party creditors could, in most of these instances, have raised irregularities between the handling of corporate affairs and the provisions of the applicable articles of incorporation or bylaws. N.R.S. 78.-135(2) states that "[n]o limitation upon the business, purposes or powers of the corporation or upon the powers of the stockholders,

officers or directors, or the manner of exercise of such powers, contained in or implied by the articles shall be asserted as between the corporation or any stockholder and any third person." Similarly, the right of a third person to assert a limitation in corporate bylaws is controlled by his reliance upon such bylaws in permitting an obligation to be incurred by the corporation on his behalf. *See generally* 18 C.J.S. *Corporations* § 181(d), at p. 593 (1939); 18 Am.Jur.2d *Corporations* § 169, at 700–01 (1965). No discussion of such reliance is found in any of the alter ego cases published in Nevada.

these cases, as Counsel for the Debtors has aptly argued, that the sort of injustice spoken of in this third element is not merely the fact that the complaining creditor will go unpaid if the corporate veil remains unparted. *See Lipshie v. Tracy Investment Co., supra* 93 Nev. at 378, 566 P.2d at 824. *See also* Note, 30 S.Cal.L.Rev. 538, 539 (1957). Nor would logic suggest that such injustice should have entered in by way of the conduct which created the initial cause of action. *Cf. Caple v. Raynel Campers, Inc.,* 90 Nev. 341, 526 P.2d 334 (1974) (the third element of the *McCleary* test held satisfied by the unconscionable conduct alone of agents of corporation which created the original cause of action). More appropriately, the Nevada courts have focussed on the element of reliance, or more particularly, on "reasonable reliance" by the complaining creditor upon debtor conduct which would indicate either the absence of a corporate form or the assumption of liability by a person or entity controlling an openly visible corporation. *See Lipshie v. Tracy Investment Co., supra* 93 Nev. at 377–79, 566 P.2d at 823–24; *Ecklund v. Nevada Wholesale Lumber Co., supra* 93 Nev. at 199, 562 P.2d at 480; *Baer v. Amos J. Walker, Inc., supra* 85 Nev. at 221, 452 P.2d at 917; *O'Connell v. Cox,* 78 Nev. 40, 368 P.2d 761 (1962). *Cf. Swartout v. Grover Collins Drilling,* 75 Nev. 297, 339 P.2d 768 (1959) (doctrine of equitable estoppel applied where oral representation made by shareholder that he would be liable on obligation); *Thompson v. Reno Sav. Bank, supra* (subscription agreement estopped shareholder from denying liability for full amount of capital investment promised therein).

When seen in the light of an equitable estoppel argument, each of the other two elements of the *McCleary* test, and the various manifestations of alter egoism noted by the Nevada Supreme Court, would apparently serve primarily as proof of the reasonableness of a complaining creditor's reliance upon a careless shareholder's questionable handling of the affairs of a closely-held, primary obligee corporation. It is not, therefore, a matter of "punishment" for the

sloppy handling of such intracorporate affairs which brings about an alter ego finding, as one general treatise might suggest, *see* Annot., 46 A.L.R.3d 428, 430–31 (1972). Instead, the courts see such sloppiness as inequitably rendering creditors prone to overlook a corporate formality to their eventual detriment. The controlling entity will therefore be estopped from denying that the faulty scenario they have drawn, or permitted to be drawn, is less than a legal reality when one of their creditors is injured by reliance upon such a portrayal.

Similarly, two other recognized doctrines might explain the application of alter ego principles in non-contractual settings. These encompass the oft-exercised refusal by courts of equity to sanction the use of statutory limitations for the purpose of perpetrating fraudulent or otherwise illegal acts. *See Moore v. DeBernardi,* 47 Nev. 33, 213 P. 1041, 220 P. 544 (1923); *Bowler v. Curler,* 21 Nev. 158, 26 P. 226 (1891); *Evans v. Lee,* 12 Nev. 393 (1877) (equitable principles applied to prevent the use of the statute of frauds to commit fraud). *See also Nehls v. William Stock Farming Co.,* 43 Nev. 253, 184 P. 212, 185 P. 563 (1919) (using the principle of equitable estoppel to block effect of statute of frauds). Indeed, Nevada statutory law purposely restricts the authorized formation of corporate entities to persons who "associate . . . for the transaction of *any lawful* business, or to promote or conduct any *legitimate* object or purpose . . . ." N.R.S. 78.-030(1) (1977) (emphasis supplied). Therefore, illegal or illegitimate acts done through corporate channels by controlling shareholders would well warrant an avoidance of the legal form adopted by the real perpetrators, who could not claim protection from a statutory shield never properly forged. *Cf. Seymour v. Hull & Moreland Eng.,* 605 F.2d 1105 (9th Cir. 1979) (under federal corporate piercing law, court would require proof of fraudulent intent in the formation of the corporation and not just in its operation).

 In the case at bar, the Court finds evidence of neither fraud nor illegality. Furthermore, no attempt has been made to demonstrate any justifiable reliance by PCK upon conduct by the Debtors herein which would indicate. an assumption, by them, of personal liability for the debts incurred by Heers Brothers, Inc. To be sure, both Heers Brothers, Inc. and Twin Lakes Village, Inc. were closely controlled by Carol D. Heers and Charles M. Heers. And, as stated earlier, some evidence can be found that the Heers individuals were benefitted by several minor uncompensated transfers from PCK's judgment debtor. It is very possible that Counsel for PCK might have prevailed in demonstrating that the passage of such transfers was in violation of Nevada's Uniform Fraudulent Conveyance Act, had he sought the remedies provided by that act and persevered in proving each element necessary to the granting of that relief. Still, that sort of constructive fraud is not really what the alter ego doctrine is aimed at preventing. There is nothing inherently inequitable about corporate officers making small transfers of corporate funds to themselves and to their families, as sole shareholders, absent a showing of intent to "hinder, delay, or defraud" creditors. Such transfers may be seen merely as informal dividend or salary payments, aimed at avoiding the costs naturally arising from the more structured dividend and salary payment procedures normally made necessary by the multiple interests represented in less closely held corporations. Provided no other shareholder exists to question such procedures, the Court is chary to grant standing to third-party creditors to enforce an any more rigorous standard of dividend or salary payment formality, especially when there has been no evidence of justifiable reliance upon more formal procedures.

 Concerning what has been characterized as the major conveyance here in question, the alleged transfer of the Paradise Spa Property of Heers Brothers, Inc. to the benefit of the Heers individuals and of Twin Lakes Village, Inc., the Court can find no evidence of an intent to avoid the payment of the just debt obligations of the transferor. The original Trust Agreement set up by Charles and Carol Heers was quite obviously aimed at providing financing for the Paradise Spa project, with the debts of Heers Brothers, Inc., found in the attached schedules B and C, see Claimant's Exhibit # 5, being satisfied by advances from Loma Linda University or through the fund-raising efforts of that Trustee/Lender. It would also be a patent misinterpretation of this agreement to find that the residual clause located in paragraph (6) thereof could refer to Charles and Carol Heers in any other way than as agents of Heers Brothers, Inc. They openly admit this agency relationship later in the Complaint filed on behalf of Heers Brothers, Inc., against Loma Linda University, which was based upon this Trust Agreement, see Claimant's Exhibit # 7, and which was accompanied by the supportive affidavit to the same effect of Carol D. Heers. Had the Trust Agreement been carried through to the final liquidation contemplated thereby, the Court is assured that any funds remaining after the payment of the priority obligations listed therein would have gone, in half, to Heers Brothers, Inc.[4] Instead, a number of fiduciary breaches allegedly occurred, throwing the matter into extensive litigation. A resolution of such litigation

---

4. The liquidation distribution clause of the April 14, 1966 Trust Agreement between Carol Heers and Charles Heers, as Trustors, and Loma Linda University, as Trustee, provides:

"6. On the liquidation of the property in this trust, or any of it, the net proceeds thereof shall be used as follows in this order:

(a) To pay any necessary operating expenses of property still retained.

(b) To repay Trustee's advances, with interest.

(c) To repay the Pacific Union Conference of Seventh-day Adventists its loans to Trustors on subject property with interest.

"Any sums remaining after completion of the foregoing payments shall be divided half to Trustors and half to Trustee."

Earlier in the Trust Agreement, however, witness is made that the Heers were acting as sole shareholders of Heers Brothers, Inc., thus evidencing their representative capacity when serving as Trustors in this agreement.

was reached, however, through the settlement entered into on March 27, 1970 by these Debtors, their affiliated corporate entities, including Heers Brothers, Inc., and Loma Linda University; which settlement was approved by this Court.

■ It is very difficult for this Court to see how the May 1970 settlement was in defraud of this, or any other, judgment creditor of Heers Brothers, Inc. The language of paragraphs (7) and (8) of the settlement document witness an attempt to satisfy certain judgment debts of Heers Brothers, Inc., arising both in California and in Nevada. It is not for this Court to decide whether or not these paragraphs might include the obligation owing to PCK. However, they do demonstrate an honest attempt by the Heers to resolve the legal problems of Heers Brothers, Inc. and not merely to avoid such difficulties through the imposition of a fraudulent corporate barrier.

Moreover, it is apparent from this settlement that, at least in the minds of the Heers, Loma Linda University had a potential claim, or series of claims, against Heers Brothers, Inc. which would have resulted in liability greater than the loss suffered through the settlement with that party. Therefore, whatever benefit might have been gained by the Heers or Twin Lakes Village, Inc. through this settlement, it was also accompanied by the concomitant benefit to Heers Brothers, Inc. of having Loma Linda University's potential claims released, along with any other potential liability arising as a result of the Paradise Spa project. As a judgment creditor, PCK's ability to reach the assets of Heers Brothers, Inc., whether legal or beneficial, was left relatively unimpaired during the nearly three-year period preceding the March 1970 settlement. Certainly, PCK could have only taken control of such assets under the restraints which Heers Brothers, Inc. had placed upon such through its legitimate financing dealings with Loma Linda University. Still, there were interests which apparently could have been reached had PCK acted quickly enough in securing its judgment through appropriate collection mechanisms. Instead, Loma Linda University moved first to consolidate its security position, in the fact of the Heers Brothers, Inc. litigation, and, in the process, it left PCK with the unenviable task of sorting through the various exchanges which took place under the March 1970 settlement to find a possible fraudulent conveyance from its judgment debtor.

■ Rather than face such an arduous project, however, the Claimant has merely sought to equate its judgment debtor with the present Debtors and to claim a portion of the assets of the estates of the latter parties. But, not having shown that the above settlement, or any of the other proven transfers, were in defraud of its position, and having failed to estop the limited liability claims of the Debtors, PCK is left with an obligation owing it from an apparently impecunious corporation. While this is unfortunate, the Court cannot now find it to be, as a matter of law or equity, unjust.

■ Even if the Court had encountered some sort of injustice which would have properly invoked the third element of the *McCleary* sanction, it is questionable that the type of unitary handling of corporate affairs envisioned by the second part of that test would be identifiable from the facts presented by PCK. Complete and direct control of a corporate entity by one or two shareholders is not sufficient, in itself, to create the degree of "unity of interest and ownership" which renders the shareholders inseparable from their corporation under the *McCleary* rule. The intent of the alter ego doctrine was not to avoid the limited liability benefits lawfully accruing to even closely-held corporations. Instead, this principle was meant to unmask "sham" corporations, see *North Arlington Medical Building, Inc. v. Sanchez Constr. Co., supra* 86 Nev. at 522, 471 P.2d at 244, which are set up solely as conduits for individual enterprise of a fraudulent or unjust nature. See *id.; Carson Meadows, Inc. v. Pease, supra* 91 Nev. at 191, 533 P.2d at 461. In the instant case, the Court is convinced that Heers Brothers, Inc. was legitimately

founded for the purpose of carrying on a lawful construction business in the state of Nevada and elsewhere. While the question of its initial capitalization was left unanswered by the witnesses presented by PCK, it is apparent that at least by July 31, 1966, see Debtors' Exhibit # D, the corporation had a substantial net worth. Also, from the testimony here elicited, the Court feels secure that the source of this net worth was not from any profits generated by projects in which Heers Brothers, Inc. had been previously engaged. The statement of Charles Heers that the corporation had lost money on all but one of its construction dealings would indicate that this net worth must have been injected into the business from its principal backers, the Heers individuals. And, even if the one profitable project did account for the whole of this net worth amount, it is significant that the corporation was permitted to maintain such an excess and to continue to operate over such an extended period of time (at least from 1960, when the Claimant's cause of action arose, until March 1970, when its business dealings came to an end with the aforementioned settlement), paying its ongoing obligations as these became due. Such corporate longevity, and propensity to make good on corporate debts, would seem to belie any assertion that the Heers were abusing this entity or its creditors for their monetary gain.

 The concept of limited liability through corporate organization and investment has been legally recognized in Nevada since before the granting of its statehood. As noted originally, corporate recognition has also been assured by the constitution of this state. Nev.Const., Art. 8, Sec. 3. Hence, "(t)he corporate cloak is not lightly thrown aside." *Baer v. Amos J. Walker, Inc., supra* 85 Nev. at 220, 452 P.2d at 916. PCK, having failed to establish, by a preponderance of the evidence, either the second or the third element of the *McCleary* alter ego test, cannot satisfy its claim against any of the above-named Debtors. Such a claim will therefore be denied.

Since the return of these proceedings by the Ninth Circuit Court of Appeals and by the United States District Court, a further alleged creditor of these Debtors has moved for an adjudication in or a dismissal of each of these proceedings. Pending a determination on such motions, and recognizing the aforementioned voluntary adjudication of Twin Lakes Village, Inc., the motions for discharge by the individual Heers Debtors will remain undetermined by this Memorandum Opinion and any consequential order. The Court, however, will prepare and file an order herewith sustaining the objections of these Debtors to the claims of PCK of Sacramento, Inc.

This Memorandum Opinion shall, for all purposes and pursuant to Bankruptcy Rule 752, serve as findings of fact and conclusions of law in this matter.