POLARIS INDUSTRIAL CORPORATION, dba DAYTON WIRE PRODUCTS, Appellant, v. MICHAEL KAPLAN, and JEROME KAPLAN, Respondents.

No. 16574

December 29, 1987             747 P.2d 884

*Chris A. Beecroft,* Las Vegas, for Appellant.

*Brown, Wells, Beller & Kravitz,* Las Vegas, for Respondents.

## OPINION

*Per Curiam:*

This case arises from a promissory note originally issued by National Marketing Services (NMS), a now-defunct Nevada corporation, to appellant Polaris Industrial Corporation for amounts owing on an account. The note was later assumed by Commercial Resources, Inc. (CRI), another Nevada corporation no longer in existence. In 1979, Polaris brought an action on the note against both corporations and their two shareholders and officers, Bob Davis and respondent Michael Kaplan. Polaris alleged Davis and

Kaplan were the alter egos of NMS and CRI. Summary judgment was entered for Polaris against the corporations. Polaris then amended its complaint to add as defendants Cambist Corporation and respondent Jerome Kaplan alleging they, too, were the alter egos of NMS and CRI. Cambist Corporation and Bob Davis defaulted. The case proceeded to trial against respondents Michael and Jerome Kaplan. The district court concluded Polaris had not borne its burden of proof in demonstrating the Kaplans were the alter egos of NMS and CRI. Judgment was entered for the defendants. Polaris appeals.

Polaris was an Ohio corporation that custom manufactured wire products. Beginning in 1976, Polaris sold wire display racks to NMS. Initially, NMS paid for the goods in advance. Later, payment was made on delivery. Eventually, NMS requested a thirty-day account. By March 1978, NMS owed Polaris $50,560.16 and was behind on payments. NMS then issued the promissory note that is the basis of this suit.

NMS sold toy distributorships. It was originally a sole proprietorship owned by Michael Kaplan. NMS incorporated in 1976 soon after its first contact with Polaris. Bob Davis and Michael Kaplan were the sole shareholders and officers of the corporation. In its most lucrative year, 1977, NMS realized a profit of about $500,000.00. It ceased to do business the following Spring. The corporate balance sheet reflected a negative equity of $154,144.00 indicating the stockholders had taken out more than they had put in.

Davis and Kaplan formed a new corporation, CRI, to sell health and beauty aid distributorships. They were again the sole shareholders and officers. CRI did business in the same location as NMS and used the same bank. It also took assignment of NMS's assets and assumed NMS's liabilities. CRI informed Polaris it had assumed NMS's note. Thereafter, Polaris received only one payment. Both NMS and CRI were sold to a party in Missouri after the institution of this suit.

The district court made a number of findings that indicated Kaplan and Davis did not always follow normal corporate procedures. Both NMS and CRI paid the personal obligations of the officers. Unnumbered counter checks were often issued to Davis and Kaplan.[1] There was no evidence that capital contributions had actually been made or that stock certificates had been issued. The only evidence of corporate meetings consisted of minutes that generally ratified all previous decisions of the prior year. Despite these findings, the court concluded Polaris had not shown an alter ego relationship between Kaplan and the corporations.

---

[1] The counter checks were blank checks obtained at the bank.

Jerome Kaplan was Michael Kaplan's brother. He was a salesman for CRI, but never had any interest in the corporation. In July 1979, Jerome formed Cambist Corporation to sell sporting goods distributorships. Cambist shared offices with CRI and paid the rent in return for use of office furniture. Cambist ceased doing business in March 1980. The district court also concluded that Jerome Kaplan was not an alter ego of CRI.

Polaris contends the district court reached the wrong conclusion. The general rule is that where the evidence is conflicting and there is substantial evidence to support the judgment, it will not be disturbed. Consolazio v. Summerfield, 54 Nev. 176, 179, 10 P.2d 629, 630 (1932). But there is an exception when it is clear that a wrong conclusion has been reached. *Id.* Our task on appeal is to determine whether the trial court's findings in this case mandated a contrary conclusion.

There are three general requirements for application of the alter ego doctrine: (1) the corporation must be influenced and governed by the person asserted to be the alter ego; (2) there must be such unity of interest and ownership that one is inseparable from the other; and (3) the facts must be such that adherence to the corporate fiction of a separate entity would, under the circumstances, sanction fraud or promote injustice. McCleary Cattle Co. v. Sewell, 73 Nev. 279, 282, 317 P.2d 957, 959 (1957). It is not necessary that the plaintiff prove actual fraud. It is enough if the recognition of the two entities as separate would result in an injustice. Gordon v. Aztec Brewing Company, 203 P.2d 522, 527 (Cal. 1979) *quoted in McCleary, supra.*

It is admitted that Michael Kaplan, along with Bob Davis, wholly owned and controlled NMS and CRI. However, there is no evidence Jerome Kaplan ever had any interest in or influence over these two corporations. Hence, this appeal fails as to Jerome Kaplan.

In determining whether a unity of interest exists between the individual and the corporation, courts have looked to factors like co-mingling of funds, undercapitalization, unauthorized diversion of funds, treatment of corporate assets as the individual's own, and failure to observe corporate formalities. *See* North Arlington Medical Building, Inc. v. Sanchez Construction Co., 86 Nev. 515, 522 n. 8, 471 P.2d 240, 244 (1970). These factors may indicate the existence of an alter ego relationship, but are not

conclusive. *See id.* There is no litmus test for determining when the corporate fiction should be disregarded; the result depends on the circumstances of each case. Mesler v. Bragg Management Co., 702 P.2d 601, 606 (Cal. 1985).

The district court found that the corporation paid Kaplan's personal obligations, that Kaplan made withdrawals of funds for his own use without following corporate procedures and that certain corporate formalities were not observed. These findings point to a unity of interest between the individual and the corporation. However, these actions must also be the cause of Polaris's injury and must have sanctioned a fraud or promoted an injustice before the corporate veil can be pierced. *See North Arlington Medical Building, supra.*

The record does not reflect how failure to issue stock or keep proper corporate minutes sanctioned a fraud or promoted an injustice to Polaris. It also does not establish that an injustice necessarily resulted from the corporation's payment of Kaplan's personal debts. Kaplan testified the payments were in lieu of salary. We also note the district court did not specifically find that the corporations were undercapitalized.

We are, however, troubled by the district court's conclusion in light of its findings that Davis and Kaplan cashed numerous unnumbered counter checks for their personal benefit and that these withdrawals further thinned the capitalization of CRI which, according to another finding, had little real assets and a negative net worth.

On July 20, 1979, the same day that Polaris served Kaplan and Davis with its complaint, Kaplan withdrew $12,500.00 by unnumbered counter check. A notation on the check charged the withdrawal to Account 140, revealed at a trial to be "Employee Advances." From August 1979 to October 1979, Kaplan and Davis made numerous payments to themselves, Jerome Kaplan and McKenzie Davis.[2] CRI's bookkeeper was not apprised of the

---

[2]The record shows these payments:

| July 20, 1979 | Michael Kaplan | $12,500.00* |
| August , 1979 | Bob Davis | 5,000.00 |
| August 7, 1979 | Michael Kaplan | 4,700.00 |
| August 10, 1979 | Jerome Kaplan | 2,000.00 |
| August 14, 1979 | Michael Kaplan | 2,500.00 |
| August 16, 1979 | McKenzie Davis | 1,500.00 |
| August 21, 1979 | Bob Davis | 1,750.00 |
| August 20, 1979 | Cash | 4,000.00* |
| August 30, 1979 | Michael Kaplan | 1,500.00* |
| October 15,1979 | Cashier's checks (Michael Kaplan, Jerome Kaplan and CRI) | 24,863.84* |

*Unnumbered counter checks

withdrawals by unnumbered checks. Kaplan admitted Davis took funds from the corporation to support his gambling habit. He, himself, claimed to have made temporary withdrawals to protect corporate funds from Davis. However, the district court found the funds were taken for the personal use of both officers. This finding is supported by notations on the checks charging them to "employee advances." R. Craig Bird, an auditor retained by Polaris, opined that CRI would have had the funds to pay its debt if the withdrawals had not further thinned the capitalization of the corporation. He also stated that CRI had few real assets because the accounts receivables carried on its books were uncollectable. The district court was entitled to accept his opinion. Our review of the record shows the district court's findings concerning the unnumbered counter checks and their effect on the corporation are supported by substantial evidence. They will, therefore, not be disturbed on appeal. Ivory Ranch v. Quinn River Ranch, 101 Nev. 471, 472, 705 P.2d 673, 675 (1985).

In light of the findings, it becomes clear that CRI's officers treated corporate funds as their own by making ad hoc withdrawals at the bank in the form of advances to themselves at a time when the corporation's debt to Polaris was not being paid, and that Polaris was damaged because these actions left the corporation without funds to repay the debt. The essence of the alter ego doctrine is to do justice. Mesler v. Bragg Management Co., *supra*, 702 P.2d at 607. We are compelled to recognize that the district court clearly reached a wrong conclusion in determining that Michael Kaplan had not been shown to be the alter ego of NMS and CRI.

Accordingly, we affirm the judgment of the district court as to Jerome Kaplan, and reverse the judgment as to Michael Kaplan.[3]

---

[3]Appellant named National Marketing Services, Commercial Resources, Inc., Cambist Corporation, Bob M. Davis, Michael Kaplan and Jerome Kaplan as respondents. However, appellant obtained judgments against all the parties except Michael and Jerome Kaplan, the only respondents to appear in this appeal. Hence, the names of the other parties have been deleted from the caption of this appeal.