In re James **GIAMPIETRO**, Debtor.

**AE Restaurant Associates, LLC, a Nevada Limited Liability Company, Plaintiff,**

v.

**James Giampietro, Defendant.**

**Bankruptcy No. BK–S–02–22743–BAM.**

**Adversary No. 03–1175–BAM.**

United States Bankruptcy Court, D. Nevada.

Nov. 23, 2004.

David J. Winterton, Las Vegas, NV, for Defendant James Giampietro.

Victoria L. Nelson, Byron Thomas, Las Vegas, NV, for Plaintiff AE Restaurant Associates, LLC.

### Opinion

BRUCE MARKELL, Bankruptcy Judge.

James Giampietro, the debtor and defendant in this adversary proceeding, is an inveterate gambler. In the year prior to his chapter 7 bankruptcy filing in November of 2002, he claims to have lost more than $700,000 gambling at various casinos in Las Vegas, including one 2–1/2 day spree at a local casino in which he lost more than $125,000.

Mr. Giampietro is also a restauranteur. During the twenty years preceding his bankruptcy, he managed or owned several restaurants in Las Vegas. This case concerns his efforts to acquire a restaurant in 2000.

The plaintiff in this adversary proceeding is AE Restaurants Associates, LLC ("AE"), a limited liability company owned and managed by a retired pathologist, Dr. Allen Anes and his wife. Prior to 2000, AE owned a restaurant in Las Vegas called the Portabello. Losses mushroomed at this restaurant; Dr. Anes testified that the restaurant lost more than $600,000 in the two years prior to 2000.

By April 2000, he had closed the restaurant. He then sought to sell its assets.

AE and Mr. Giampietro negotiated with each other for the sale of these assets, and for a transfer of the lease of its location. During these negotiations, Mr. Giampietro formed a Nevada limited liability company, Chianti Café, LLC ("Chianti Café"), as his acquisition vehicle. A deal was signed under which Chianti Café would buy AE's assets for $200,000. Twenty thousand dollars were placed in escrow under this agreement, pending a closing and transfer of the assets, which was to occur as soon as Chianti Café acquired a liquor license.

The deal never closed for reasons that remain disputed. Chianti Café sued AE in state court for the return of the $20,000; AE counterclaimed for breach of contract, and ultimately obtained a judgment against Chianti Café for $130,000.[1] By the time AE obtained this judgment, and sought to add Mr. Giampietro as a defendant, however, Mr. Giampietro had filed his chapter 7 case.

AE then commenced this adversary proceeding against Mr. Giampietro seeking to deny his discharge under 11 U.S.C.

1. This judgment was essentially a default judgment, as the state court arbitrator to whom the case had been assigned struck Chianti Café's answer to AE's counterclaim for refusal to cooperate in discovery.

2. AE originally had also sought a declaration of non-dischargeability of the debt arising from the failed acquisition debt under 11 U.S.C. § 523(a)(2), but dropped this claim in its pre-trial statement. In addition, at trial AE attempted to introduce evidence tending to show that Mr. Giampietro was not entitled to a discharge under Section 727(a)(2) for making false oaths in his schedules, or under Section 727(a)(5) for failing to satisfactorily explain a loss of his assets. The debtor objected to this proffer, and the court sustained the objection, since the date to assert claims regarding the denial of the discharge had long passed, and the proffered evidence did not relate to the core of operative facts at issue

§ 727(a)(3).[2] Trial took two days. After hearing the testimony of the parties and reviewing the record in this case, the court will enter judgment in favor of Mr. Giampietro.

## I.

## AE's Need to Establish Alter Ego Status

■ AE's initial hurdle is standing. Under Section 727(c), standing to pursue denial of a discharge is limited to "[t]he trustee, a creditor, or the United States trustee." Neither the chapter 7 trustee nor the United States trustee joined in AE's complaint, so AE's ability to pursue this action turns on its status as a "creditor."

■ Many hops within the Code are necessary to pin down what constitutes a "creditor." Section 101(10)(A) states that "[c]reditor means—[¶] entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor ..." AE, as a limited liability company is an "entity" under Section 101(15),[3] so the sole issue remaining is

with respect to the Section 727(a)(3) claim. See Kontrick v. Ryan, 540 U.S. 443, 124 S.Ct. 906, 917, 157 L.Ed.2d 867 (2004); COLLIER ON BANKRUPTCY ¶ 4004.02[3] (15th rev. ed.2004). In the face of such an objection, AE's attempt to amend its complaint at trial to conform to its proffered evidence under FED. R. BANKR. PRO. 7015(b) was prejudicial to debtor and improper.

3. Even though the Bankruptcy Code does not explicitly mention limited liability companies, as the Code was adopted before such entities were widely-used, most courts and commentators agree that they are analogous to corporations, defined at Section 101(9) of the Bankruptcy Code. Thus, they are "persons" as defined in Section 101(41). See In re Midpoint Development, L.L.C., 313 B.R. 486 (Bankr.W.D.Okla.2004) (LLC is a "person" for purposes of being a "debtor"); In re

whether AE had "a claim against the debtor that arose ... before the order for relief."

■ The Bankruptcy Code intentionally defines "claim" broadly. Under Section 101(5), a claim means a:

(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

(B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

Without a doubt, AE had a claim, as used in Section 101(5), against Chianti Café.

## II.

### Does The Alter Ego Doctrine Apply to Nevada Limited Liability Companies?

But is a claim against a limited liability company in which the debtor is the only member also a claim against that member?

■ The initial answer is, of course, no. Nevada law expressly limits the liability of a member of a limited liability company;

that is the purpose of "limited liability" in the name of the entity. As stated in Nevada statutory law, "[u]nless otherwise provided in the articles of organization or an agreement signed by the member or manager to be charged, no member or manager of any limited-liability company formed under the laws of this state is individually liable for the debts or liabilities of the company." NEV. REV. STAT. § 86.371 (2004).

■ AE counters that it is a creditor because, under an extension of Nevada law,[4] James Giampietro is the "alter ego" of Chianti Café.[5] Under analogous corporate law, Nevada courts have recognized that claimants who plead and prove specific elements of control, identity and resulting fraud or injustice may ignore statutory limited liability of corporate shareholders. *See, e.g., LFC Mktg. Group, Inc. v. Loomis,* 116 Nev. 896, 8 P.3d 841 (Nev.2000); *Frank McCleary Cattle Co. v. Sewell,* 73 Nev. 279, 317 P.2d 957 (Nev.1957). Recent Nevada statutory law, enacted in 2001, also recognizes this exception as to corporations. *See* NEV. REV. STAT. § 78.747 (2004), added by ch. 601, § 1, 2001 Nev. Stat. 3170.

■ The question is whether Nevada law would recognize "alter ego" claims with respect to limited liability companies.

---

*ICLNDS Notes Acquisition, L.L.C.,* 259 B.R. 289, 293 (Bankr.N.D.Ohio 2001) (same). *See also* Sally S. Neely, *Partnerships and Partners and Limited Liability Companies and Members in Bankruptcy: Proposals for Reform,* 71 AM BANKR. L.J. 271, 286–93 (1997) (concluding that LLCs are, for most purposes, "persons" under the Bankruptcy Code); Thomas F. Blakemore, *Limited Liability Companies and the Bankruptcy Code: A Technical Review,* 13 AM. BANKR. INST. J. 12 (June 1994) (noting that limited liability companies appear to qualify as "corporations"). "Persons," in turn, are included within Section 101(15)'s definition of "entities."

4. As noted recently by Judge Reed, "[t]he determination of whether an individual is the alter ego of a corporation is governed by Nevada state law." *Mallard Auto. Group, Ltd. v. LeClair Mgmt. Corp.,* 153 F.Supp.2d 1211, 1213 (D.Nev.2001).

5. The OXFORD ENGLISH DICTIONARY defines an "alter ego" as a "second self." The term is from the Latin, *alter* meaning "another," and *ego* meaning "I" or "self."

The alter ego doctrine has a long and contentious history. Its origins lie in equity, and the desire of courts to not permit investors to manipulate the statutory privilege of limited liability to the knowing disadvantage of those who deal with the corporation. *See, e.g.*, STEPHEN B. PRESSER, PIERCING THE CORPORATE VEIL § 1:3 (2004). As often as it is raised, however, it seems as often not to be found. *See, e.g.*, Robert B. Thompson, *Piercing the Corporate Veil: An Empirical Study*, 76 CORNELL L. REV. 1036 (1991) (finding that alter ego claims succeed only about 40% of the time). As two well-known commentators phrased it, the alter ego doctrine and its result of piercing the corporate veil is "like lightning, it is rare, severe, and unprincipled. There is a consensus that the whole area of limited liability, and conversely of piercing the corporate veil, is among the most confusing in corporate law." Frank H. Easterbrook & Daniel R. Fischel, *Limited Liability and the Corporation*, 52 U. CHI. L. REV. 89, 89 (1985).[6]

The "unprincipled" nature of the doctrine and the confusion it generates has lead some to call the theory into question as a useful common law doctrine. *See* Stephen M. Bainbridge, *Abolishing Veil Piercing*, 26 J. CORP. L. 479 (2001); Douglas C. Michael, *To Know a Veil*, 26 J. CORP. L. 41 (2000). Regardless, no court or legislature has yet sought to eliminate the doctrine.

Indeed, many states, including Nevada, have formally incorporated it into their statutory schemes for corporations. *See* NEV. REV. STAT. § 78.747 (2004). This codification as to corporations, however, leaves open the question as to whether to extend similar principles to limited liability companies.

The argument in favor of this extension is that the doctrine is an equitable one that allows courts to scuttle subterfuges designed to injure creditors at the expense of owners; the argument against is that, although Nevada generally recognized limited liability companies in 2001 when it codified the alter ego doctrine for corporations, it did not similarly codify the doctrine for limited liability companies. This lacuna arguably creates a negative inference that there is no alter ego exception for limited liability companies. No Nevada court has considered this issue, and thus this Court must make a guess as to what a Nevada court would do in a similar situation.

If presented with the issue, this court believes it highly likely that Nevada courts would recognize the extension of the alter ego doctrine to members of limited liability companies. The varieties of fraud and injustice that the alter ego doctrine was designed to redress can be equally exploited through limited liability companies. As recently stated by the Nevada Supreme Court, "the 'essence' of the alter ego doctrine is to 'do justice' whenever it appears that the protections provided by the corporate form are being abused." *LFC Mktg. Group, Inc. v. Loomis,* 116 Nev. 896, 903, 8 P.3d 841, 845–46 (Nev.2000). With respect to limited liability companies, the "protections" of limited liability provide the same sort of possibilities for abuse.

Against this strong policy of preventing abuse of limited liability, the court discounts heavily any argument that Nevada's codification of the principles of alter ego liability for corporations in 2001 created a negative inference that the Nevada

---

**6.** It is also a malleable doctrine; when federal interests are present, a federal standard will apply, and that standard often will be less strict than state law. *See SEC v. Elmas Trad-* *ing Corp.,* 620 F.Supp. 231, 234 (D.Nev.1985) ("Federal analysis give less respect to the corporate form than does the strict common-law alter ego doctrine.").

legislature intended to abrogate alter ego liability with respect to limited liability companies. Although some states have explicitly provided for alter ego liability for limited liability companies,[7] the sparse legislative history of the 2001 Nevada legislation indicates that legislators were interested in increasing corporate franchise fees, and were prepared to codify corporate alter ego liability as a price for that increase.[8]

Nowhere in the legislative minutes or other scraps of legislative history, however, is there any indication of an intent to tighten or clarify alter ego liability for corporations while eliminating it for limited liability companies or any other limited liability entity (such as limited partnerships, limited-liability partnerships or limited-liability limited partnerships). Indeed, such a course would be counterproductive, in that it would disfavor the creating of corporations, which would lessen overall corporate franchise fee revenues. The conclusion thus drawn is that the 2001 legislation dealt only with corporations, and left untouched the law with respect to limited liability companies.

Against this background, the court believes that Nevada courts would apply the same common law standards for alter ego liability to members of limited liability companies that they have placed upon shareholders of corporations.[9] *See, e.g.,*

---

7. *See, e.g.,* Cal. Corp. Code § 17101(b) (2004); Ga. Code Ann. § 14–11–314 (2004); Minn. Stat. § 322B.303 (2004); Mont. Code Ann. § 33–22–1814 (2004).

8. Although Nevada legislative history is scarce and often fraught with peril for the careful investigator, it can sometimes be useful. *See, e.g., Baliotis v. Clark County,* 102 Nev. 568, 570, 729 P.2d 1338, 1339–40 (Nev. 1986) ("Limited resort to reports of legislative committee hearings is appropriate to clarify or interpret legislation that is of doubtful import or effect."). With respect to the bill that became Nev.Rev.Stat. § 78.747, the published minutes for the relevant committees for both chambers of the Nevada legislature for that bill—S.B. 577—indicate a common purpose. *See* Minutes of Nevada Senate Comm. on Judiciary, 71st Sess. (May 22, 2001), *reprinted at* http://www.leg.state.nv.us/71st/Minutes/Senate/JUD/Final/1464.html ("Senator Washington asked whether the protection placed around corporate officers and stockholders will be inducement enough for corporations to come into Nevada, if the filing fees are raised. Senator James answered it is an added incentive. He explained [that ...] the protection regarding the corporate veil, which is a codification of existing case law defining the criteria for when the corporate veil can be pierced to get at the assets of the person who incorporated."); Minutes of Nevada Assembly Comm on Judiciary, 71st Sess. (June 1, 2001), *reprinted at*

http://www.leg.state.nv.us/71st/Minutes/Assembly/JUD/Final/1603.html ("Assemblywoman Buckley said she supported the motion because the fees were necessary to fund education.... The Senate testimony offered corporations 'more predictability under the law' in exchange for the increased fees.... The amendment codified statutory law instead of relying on case law.... S.B. 577, as amended, would provide the funds needed for education, as well as relief for victims in Nevada.... Assemblywoman Buckley said S.B. 577 clarified and put forward the Senate's intent by codifying law instead of relying on case law, and preserved the fees for education.").

9. For several recent cases which suggest, either overtly or by implication, that the tests are the same for piercing the veil in a corporate or limited liability context, *see, e.g., Bonner v. Brunson,* 262 Ga.App. 521, 585 S.E.2d 917 (2003), *cert. denied,* (Jan. 12, 2004); *Williams Oil Co., Inc. v. Randy Luce E–Z Mart One, LLC.,* 302 A.D.2d 736, 757 N.Y.S.2d 341 (3d Dep't 2003); *KLM Industries, Inc. v. Tylutki,* 75 Conn.App. 27, 815 A.2d 688 (2003); *Advanced Telephone Systems, Inc. v. Com–Net Professional Mobile Radio LLC,* 59 Pa. D. & C. 4th 286 (Common Pleas Court of Allegheny County, 2002). *See also* 2 Larry E. Ribstein and Robert R. Keatinge, Ribstein and Keatinge on Limited Liability Companies § 12:3 (2004); David L. Cohen, *Theories of the Corporation and the Limited Liability Company: How Should Courts and Legislatures Articulate*

*Mills v. Webster (In re Multimedia Communs. Group Wireless Assoc. of Liberty County, Georgia, L.C.),* 212 B.R. 1006 (Bankr.M.D.Fla.1997) (holding members of Nevada limited liability company liable for LLC's obligations).[10]

## III.

### Nevada Alter Ego Principles

The common law standard in Nevada for such alter ego liability has been fairly well established since 1957 when the Nevada Supreme Court decided *Frank McCleary Cattle Co. v. Sewell,* 73 Nev. 279, 317 P.2d 957 (Nev.1957). In that case, Sewell had successfully sued a timber company owned by Frank McCleary and his wife. By the time Sewell sought to execute on his judgment, McCleary and wife had formed a new corporation, the Frank McCleary Cattle Company, and had caused the timber company to transfer all of its assets, worth millions, to the new corporation. Sewell sought to add the new cattle company to the judgment against the timber company

without the necessity of bringing a new lawsuit against the cattle company.[11]

■ The Nevada Supreme Court permitted the addition. Borrowing from California law,[12] the Nevada Supreme Court set out three requirements for ignoring the separate existence of a corporation:

(1) The corporation must be influenced and governed by the person asserted to be its alter ego. (2) There must be such unity of interest and ownership that one is inseparable from the other; and (3) The facts must be such that adherence to the fiction of separate entity would, under the circumstances, sanction a fraud or promote injustice.

*McCleary Cattle Co.,* 73 Nev. at 282, 317 P.2d at 959.

The Court found that Frank McCleary, as president and co-owner of both companies, influenced and made all decisions, thus satisfying the first requirement. The identical ownership between the timber and cattle companies satisfied the second requirement.

*Rules for Piercing the Veil, Fiduciary Responsibility and Securities Regulation for the Limited Liability Company?,* 51 OKLA. L. REV. 427 (1998).

**10.** It may very well be that while the same principles used in corporate alter ego cases may apply to limited liability companies, they may apply with different weight. As has been noted,

the practice of corporate veil-piercing because of domination by an owner, the application of the classic "alter-ego" doctrine, may not be appropriate in the context of the limited liability company. Most limited liability company statutes allow members to manage the LLC. This provision illustrates a legislative intent to allow small, one-person and family-owned businesses the freedom to operate their companies themselves and still enjoy freedom from personal liability.

STEPHEN B. PRESSER, PIERCING THE CORPORATE VEIL § 4:2 (2004). *See e.g.,* CAL CORP. CODE

§ 17101(b) (2004) (failure to observe organizational formalities not to be a factor in alter ego liability of members under certain circumstances); GA. CODE ANN. § 14–11–314 (2004) (same).

**11.** Which it could have; under traditional principles of successor liability and fraudulent transfer law, Sewell certainly could have alleged that the new cattle company was the "mere continuation" of the timber company, and obtained the cattle company's liability in that way. *See* Robert Charles Clark, *The Duties of the Corporate Debtor to Its Creditors,* 90 HARV. L. REV. 505, 540–53 (1977). This strategy, however, would have likely required a new lawsuit against the cattle company, and Sewell had already successfully appealed his judgment for some $75,000. against the timber company to the Nevada Supreme Court. *Henry McCleary Timber Co. v. Sewell,* 72 Nev. 231, 301 P.2d 1047 (1956).

**12.** *Mirabito v. San Francisco Dairy Co.,* 8 Cal. App.2d 54, 47 P.2d 530 (1935).

With respect to the avoidance of sanctioning a fraud or injustice, the Court said that " '[i]t is not necessary that the plaintiff prove actual fraud. It is enough if the recognition of the two entities as separate would result in an injustice.' " *McCleary Cattle Co.*, 73 Nev. at 282, 317 P.2d at 959, *quoting Gordon v. Aztec Brewing Co.*, 33 Cal.2d 514, 522, 203 P.2d 522, 527 (1949). Not much more was said on this ground, the Court relying on citation to several other California cases for its analysis.[13]

■ This three-part analysis was adopted by the Nevada legislature in 2001, as stated earlier. The result of that codification was NEV. REV. STAT. § 78.747, which states:

1. Except as otherwise provided by specific statute, no stockholder, director or officer of a corporation is individually liable for a debt or liability of the corporation, unless the stockholder, director or officer acts as the alter ego of the corporation.

2. A stockholder, director or officer acts as the alter ego of a corporation if:

(a) The corporation is influenced and governed by the stockholder, director or officer;

(b) There is such unity of interest and ownership that the corporation and the stockholder, director or officer are inseparable from each other; and

(c) Adherence to the corporate fiction of a separate entity would sanction fraud or promote a manifest injustice.

3. The question of whether a stockholder, director or officer acts as the alter ego of a corporation must be determined by the court as a matter of law.

This statute essentially codifies the test and result of *McCleary Cattle Co.*[14]

---

**13.** In particular, the court cited *Gordon v. Aztec Brewing Co.*, 33 Cal.2d 514, 523, 203 P.2d 522, 527 (1949) (fraud or injustice requirement satisfied when "confusion would be promoted and an unjust result be accomplished if the maintenance of the two entities controlled by the same persons and having an identical name were permitted to frustrate a meritorious claim."); *Wilson v. Stearns*, 123 Cal.App.2d 472, 486, 267 P.2d 59, 69 (1954) ("Where it appears that a corporation is being used merely as an instrumentality through which an individual who is the owner of its capital stock transacts his business, and where an inequitable result would ensure, the two should be considered as one, ....The injustice here manifest [*sic*] is that to recognize respondent George Steams and Alamo Development Co., Inc., as two separate and distinct entities would permit the former to avoid his liability on a contract through use of the corporate fiction for that purpose."); *Taylor v. Newton*, 117 Cal.App.2d 752, 760, 257 P.2d 68, 73 (1953) ("Here confusion would be promoted and an unjust result be accomplished if the maintenance of the two entities controlled by the same persons and having an identical name were permitted to frustrate a

meritorious claim."); and *Grant v. United States Elec. Corp.*, 125 Cal.App.2d 193, 270 P.2d 64 (1954)(injustice found when sole owner of corporation induced extension of credit on basis of owner's financial worth, and then attempted to evade liability by interposing corporation as debtor; evidence also tended to show that owner never intended to perform, or cause corporation to perform, on promise made).

**14.** The persnickety might quibble that the statute requires "manifest injustice," instead of just the plain old "injustice" mentioned in *McCleary Cattle Co.*, but this court refuses to parse degrees of injustice. If injustice is established by a preponderance of the evidence, it is both plain and manifest, especially to the aggrieved party. *Compare* NEVADA SENATE BILL 577, 71st Sess. 1 (May 19, 2001) (bill draft as introduced) (containing requirement that all elements of alter ego liability be proved by clear and convincing evidence) *with* NEVADA SENATE BILL 577, 71st Sess. 1 (May 25, 2001) (bill draft after first amendment) (dropping any mention of quantum of proof necessary to establish liability).

AE believes that the facts in this case fit the test of *McCleary Cattle Co.* and its progeny; Mr. Giampietro vigorously disputes this claim. To sort out these competing claims, more will have to be known about the aborted acquisition.

## IV.

## Application of Nevada Alter Ego Principles Against Debtor and Chianti Café

### A. *Detailed Examination of the History of the Purchase Agreement*

The testimony of Dr. Anes established that the Portabello restaurant had lost money hand over fist, and that he had caused AE to shutter the restaurant in April of 2000 in order to stem its losses. He then testified that he caused AE to try to sell the restaurant, using a broker by the name of Robert Goodsett to represent AE. After initially marketing the restaurant at $395,000, reality set in, AE lowered the asking price, and then Mr. Goodsett reported that Mr. Giampietro, through his broker Carolyn Frei, was interested. The parties negotiated through their brokers, and reached a price of $200,000 for the restaurant assets of the Portabello, and an agreement that Chianti Café would assume the lease of the restaurant's premises.

During this process, on July 18, 2000, Mr. Giampietro formed Chianti Café, LLC as a Nevada limited liability company. On July 28, 2000, Mr. Giampietro and Dr. Anes met at Dr. Anes' home. Dr. Anes signed a purchase agreement (the "Agreement") on behalf of AE as seller, and Mr. Giampietro signed for Chianti Café as buyer. Under this Agreement, Chianti Café was to deposit $20,000 "earnest money" into escrow, and to pay the balance at a closing to occur soon after Chianti Café obtained a liquor license for the new restaurant. The $20,000 was in the nature of earnest money, which the Agreement treated as liquidated damages should Chianti Café not close the deal.

The parties disagree over whether Mr. Giampietro was to guarantee personally Chianti Café's obligations to AE under the Agreement. Dr. Anes was adamant that he understood that Mr. Giampietro was to guarantee Chianti Café's obligations under the agreement, and AE introduced evidence that Dr. Anes, on behalf of AE, had requested and obtained a financial statement from Mr. Giampietro (actually, AE obtained a copy of a financial statement that Mr. Giampietro had given to Bank of America earlier during 2000).

■ Mr. Giampietro was equally adamant that he never agreed to give AE a guaranty of Chianti Café's obligations to AE. In Mr. Giampietro's favor is that fact that the Agreement no where mentions a guaranty by Mr. Giampietro of Chianti Café's obligations to AE.[15] Moreover, while a copy of the signed Agreement as well as drafts of the Agreement were produced, no guaranty signed by Mr. Giampietro was produced, nor was a draft of any proposed guaranty. Mr. Giampietro did, however, introduce a signed guaranty in favor of the landlord. His credible testimony was that: the landlord insisted on Mr. Giampietro's

---

**15.** This absence speaks volumes; the Agreement also contains an integration clause which essentially states that it contains all the material points of the deal between AE and Chianti Café. In such cases, the parol evidence typically bars efforts to introduce evidence of additional oral covenants or conditions since the presence of the integration clause is at least prima facie evidence that the agreement is complete, any and all other terms or proposals having been discharged or rejected upon execution of the contract. *See Kaldi v. Farmers Ins. Exchange,* 117 Nev. 273, 281, 21 P.3d 16, 21 (Nev.2001); RESTATEMENT (SECOND) CONTRACTS § 213 (1981).

guaranty as a condition of consenting to the lease transfer; and Chianti Café needed to have the landlord bound to honor Chianti Café as a tenant in order to apply for a liquor license.[16]

■ Dr. Anes' testimony essentially was that he, on behalf of AE, did not distinguish between Chianti Café, LLC and Mr. Giampietro. This testimony, however, is somewhat undercut by other parts of his testimony in which he stated that he wanted a guaranty from Mr. Giampietro— why obtain a guaranty unless there were two entities? His testimony was further discredited by his and AE's conduct in the subsequent state court litigation. In that litigation, Chianti Café, LLC was the initial plaintiff and AE the initial defendant; in its answer and counterclaim, AE never sought to name Mr. Giampietro individually. Finally, Dr. Anes knew, or he and his advisors should have known, that any guaranty would have had to have been in writing, since the Nevada statute of frauds requires "[e]very special promise to answer for the debt, default or miscarriage of another" to be evidenced by some writing signed by the guarantor. NEV. REV. STAT. § 111.220.2 (2004); *see also Tri–Pacific Comm. Brokerage, Inc. v. Boreta,* 113 Nev. 203, 205, 931 P.2d 726, 728 (1997) (" 'Under ... Nevada law, contracts of guarantee are subject to the statute of frauds.' "), *quoting Pentax Corp. v. Boyd,* 111 Nev. 1296, 1299, 904 P.2d 1024, 1026 (Nev.1995).

B. *Nevada Alter Ego Doctrine, Chianti Café, and James Giampietro*

■ Against this background, is the debtor the alter ego of Chianti Café, LLC such that AE is a creditor with standing? This Court does not think so, and an application of the three requirements of *McCleary Cattle Co.* and NEV. REV. STAT. § 78.747 illustrates why.

To recap, under *McCleary Cattle Co.,* an entity is the alter ego of another if:

(1) The corporation must be influenced and governed by the person asserted to be its alter ego. (2) There must be such unity of interest and ownership that one is inseparable from the other; and (3) The facts must be such that adherence to the fiction of separate entity would, under the circumstances, sanction a fraud or promote injustice.

73 Nev. at 282, 317 P.2d at 959. Although there are many Nevada cases construing the alter ego doctrine, the cases generally recognize, and start with the admonition that, "the corporate cloak is not lightly thrown aside." *Baer v. Amos J. Walker, Inc.,* 85 Nev. 219, 220, 452 P.2d 916, 916 (Nev.1969).

Here, while at all times relevant Chianti Café was a separate entity, there is no question that Mr. Giampietro "influenced and governed" the activities and actions of Chianti Café. Chianti Café was a one-person limited liability company, formed to acquire the Portabello restaurant. It did whatever James Giampietro wanted, because he was the sole flesh-and-blood person who was connected with it. *See Lorenz v. Beltio, Ltd.,* 114 Nev. 795, 808, 963 P.2d 488, 496 (Nev.1998) (clear that two shareholders, being the only individuals involved with the corporations, had requisite control and influence); *Mosa v. Wilson–Bates Furniture Co.,* 94 Nev. 521, 523, 583 P.2d 453, 454 (Nev.1978); *Caple v. Raynel Campers, Inc.,* 90 Nev. 341, 344, 526 P.2d 334, 336 (Nev.1974). *Cf. Carson Meadows Inc. v. Pease,* 91 Nev. 187, 191, 533 P.2d 458, 461 (Nev.1975) (although

---

**16.** The parties skirmished over nettling little disputes regarding leases of phone equipment and health violations, but the court finds that the chief, and most important, condition to closing the purchase was Chianti Café's acquisition of a liquor license.

wife of corporate president was vice president, secretary and stockholder in corporate entity, she essentially acted as a "office manager and secretary" despite titles, and thus did not exert required influence and control); *Plotkin v. National Lead Co.,* 87 Nev. 51, 52, 482 P.2d 323, 324 (Nev.1971) (writing letter requesting extension of time to pay "debt we owe you through American Paint" insufficient to show control and influence of writer over American Paint).

It is also clear that there was a unity of interest, at least from the Chianti Café side. Chianti Café was owned wholly by James Giampietro, and Mr. Giampietro made all the business decisions. Other creditors of Mr. Giampietro, however, would not consider Chianti Café "inseparable" from James Giampietro; indeed, the $20,000 escrow deposit made by Chianti Café was as effectively separate from Mr. Giampietro's creditors as would be any other voluntary transfer. While this feature may limit the class of creditors that could assert an alter ego claim, cases still treat it as present when, from the complaining creditor's perspective, the entity they dealt with and the putative alter ego possessed the same unity of ownership and interest. *Compare North Arlington Med. Bldg., Inc. v. Sanchez Const. Co.,* 86 Nev. 515, 521–23 & n. 3, 471 P.2d 240, 244–45 & n. 3 (Nev.1970) (after finding that the ability to withdraw cash from corporation owned by individual's children did not establish unity of interest between that individual and the corporation, court listed 23 different factors that contribute to a finding of a unity of interest) with *Polaris Indus. Corp. v. Kaplan,* 103 Nev. 598, 603, 747 P.2d 884, 888 (Nev.1987) (unity of interest shown when corporate "officers treated corporate funds as their own by making ad hoc withdrawals at the bank in the form of advances to themselves at a time when the corporation's debt to Polaris

was not being paid."). *See also Bonanza Hotel Gift Shop, Inc. v. Bonanza No. 2,* 95 Nev. 463, 467, 596 P.2d 227, 229 (Nev.1979) (reaffirming test that unity of interest is shown when there is "such unity of interest and ownership that one is inseparable from the other"); *Mosa v. Wilson–Bates Furniture Co.,* 94 Nev. 521, 524, 583 P.2d 453, 454 (Nev.1978) (finding unity of interest when "there was 'unity and interest of ownership of such nature that the corporation had no apparent independent business operation.'" *citing Caple v. Raynel Campers, Inc.,* 90 Nev. 341, 344, 526 P.2d 334, 336 (Nev.1974)).

As a consequence, this case resolves around the third requirement of *McCleary Cattle Co.:* whether "adherence to the fiction of separate entity would, under the circumstances, sanction a fraud or promote injustice." *McCleary* itself indicates that the standard here is not that of actual fraud—as the case itself states, "'It is not necessary that the plaintiff prove actual fraud. It is enough if the recognition of the two entities as separate would result in an injustice.'" *McCleary Cattle Co.,* 317 P.2d at 959, 73 Nev. at 282, *quoting Gordon v. Aztec Brewing Company,* 33 Cal.2d 514, 522, 203 P.2d 522, 527 (1949). Later Nevada cases establish further that, unlike traditional fraud (which must be shown by clear and convincing evidence), proof of alter ego status need only be shown by a preponderance of the evidence. *Paul Steelman, Ltd. v. Omni Realty Partners,* 110 Nev. 1223, 1225, 885 P.2d 549, 550 (Nev.1994); *Wyatt v. Bowers,* 103 Nev. 593, 597, 747 P.2d 881, 883 (Nev.1987); *North Arlington Med. Bldg., Inc. v. Sanchez Const. Co.,* 86 Nev. 515, 522, 471 P.2d 240, 244 (Nev.1970) ("it is incumbent upon the one seeking to pierce the corporate veil, to show by a preponderance of the evidence, that the financial

setup of the corporation is only a sham and caused an injustice.").

■ The Nevada cases struggle somewhat with the precise contours of the requirement of avoiding fraud and not promoting of injustice. More than twenty years ago, Judge Lloyd George attempted to synthesize the Nevada cases through 1980. He concluded that, in deciding what type of injustice is covered by this requirement, Nevada courts have focused on "the element of reliance, or more particularly, on 'reasonable reliance' by the complaining creditor upon debtor conduct which would indicate either the absence of a corporate form or the assumption of liability by a person or entity controlling an openly visible corporation." *In re Twin Lakes Village, Inc.*, 2 B.R. 532, 542 (Bankr.D.Nev. 1980).[17] In formulating this standard, Judge George also properly found that Nevada cases eliminated particular acts from the domain of fraud and injustice. Simply not being paid, for example, is not, in and of itself, sufficient injustice. *In re Twin Lakes*, 2 B.R. at 542 (*citing Lipshie v. Tracy Inv. Co.*, 93 Nev. 370, 378, 566 P.2d 819, 824 (Nev.1977)); *see also Paul Steelman, Ltd. v. Omni Realty Partners*, 110 Nev. 1223, 1226, 885 P.2d 549, 551 (Nev.1994).

Judge George's reading of the then-extant cases was sound then, and is sound now. In *Lipshie v. Tracy Inv. Co.*, 93 Nev. 370, 566 P.2d 819 (Nev.1977), for example, the entity liable and its purported alter ego had, as here, an identity of ownership, and an identity of management. As the Nevada Supreme Court noted, "[t]his, without more, is insufficient." 93 Nev. at 378, 566 P.2d at 823. The plaintiff had tried to show the third element was met through a combination of the fact that it had not been paid, and that the nominal debtor had been undercapitalized. The Supreme Court rejected this showing. The court noted that Lipshie was savvy enough to request an indorser on the note that formed the basis of his claim; that indorser, however, turned out not to be good for the debt when it came due, and so he sought to obtain the liability of one Tracy. As the court noted:

> Lipshie accepted the promissory note without objection or protest; he failed or otherwise neglected to request its redrafting to include Tracy as a joint obligor; ... and he has admitted that he did not know that Tracy might potentially be liable on the note or that Wolf may be the agent of Tracy until the post-default period.

---

**17.** This formulation of the third *McCleary Cattle Co.* requirement also resolves Mr. Giampietro's claim that AE is not a proper party because Nevada alter ego claims are property of the estate, and thus AE has no standing to pursue or establish the claim. *See CBS, Inc. v. Folks (In re Folks)*, 211 B.R. 378 (9th Cir. BAP 1997); Thomas R. Phinney, *The Trustee's Standing to Pursue Alter Ego Claims*, 26 CAL. BANKR. J. 214 (2002). Under the *Twin Lakes* formulation, alter ego claims in Nevada may be pursued by less than all creditors, since the level of fraud or injustice may differ among creditors. As an example, compare the contract liability of Chianti Café to the attorney who formed it with AE's claim in this case. Given the centrality of Chianti Café's attorney in the formation of the entity, it would hardly

be unjust to respect limited liability with respect to any claims for his or her fees, while third-party creditors, such as AE, may very well present different circumstances regarding fraud or injustice, based on different representations or expectations. *See In re Folks*, 211 B.R. at 385 (noting that California law provides for two types of alter ego claims; one possessed by the corporate entity—and which are property of the estate—and one possessed by individual creditors—which such creditors may pursue without bankruptcy court approval). The court does not reach the issue of whether Nevada would recognize a variety of alter ego liability which might be property of the estate, which, for example, could exist if the corporate form was used to knowingly avoid all debts.

*Lipshie,* 93 Nev. at 378–79, 566 P.2d at 824. *See also Baer v. Amos J. Walker, Inc.,* 85 Nev. 219, 452 P.2d 916 (Nev.1969) (lack of proof of reliance on separate credit of the alleged alter ego fatal to alter ego claim).

The facts are strikingly similar here. Dr. Anes, on behalf of AE, accepted the Agreement without any signature of Mr. Giampietro. Although he testified that he understood Mr. Giampietro would guaranty something, he was never clear on what that something was (besides a superfluous guaranty of Dr. Anes' own guaranty of the lease obligation). No testimony was given as to any efforts to ensure that a guaranty would be signed. Finally, in the state court litigation, Mr. Giampietro was never named, underscoring the fact that AE looked exclusively to Chianti Café as its obligor.

Nevada cases decided after *Twin Lakes* confirm Judge George's reading. In *Rowland v. Lepire,* 99 Nev. 308, 318, 662 P.2d 1332, 1338 (Nev.1983), for example, the Lepires had contracted with the Rowland Corporation to build a house. Rowland's stock was owned by Glen and Martin Rowland; all dealings with respect to the construction contract were with one of these two individuals. When dealings on the construction went sour, the parties sued each other and, after trial, the court not only found Rowland Corporation liable for $65,000, but also found that Glen and Martin were personally liable for that amount as alter egos of Rowland Corporation.

The Nevada Supreme Court disagreed. After finding that Glen and Martin (and some miscellaneous family members) were the only stockholders, it reviewed the trial court's findings that total capitalization in the four years Rowland had been in existence was only $1,100. It also reviewed the findings that while Rowland Corporation had a corporate checking account, it

had a negative net worth at trial, and apparently never followed any corporate formalities. Despite affirming that Rowland Corporation was undercapitalized "and that there was little existence separate and apart from Martin and Glen," *Rowland,* 99 Nev. at 318, 662 P.2d at 1338, the court did not find that Lepire had proved its alter ego case, supporting its reasoning by citing to *North Arlington Med. Bldg., Inc. v. Sanchez Const. Co.,* 86 Nev. 515, 471 P.2d 240 (Nev.1970). In that case, the Nevada Supreme Court had also found inadequate capitalization, but had found that the aggrieved party had "failed to show any causal connection between the [lack of] financing and the inability to pay [the aggrieved party], or how it sanctioned a fraud or promoted an injustice." This statement was based in part on the fact that the aggrieved party had never relied on the interchangeability between the corporation involved and its owners.

Similarly, in *Polaris Indus. Corp. v. Kaplan,* 103 Nev. 598, 602, 747 P.2d 884, 887 (Nev.1987), the court affirmed a finding that a salesman was not the alter ego of a corporate defendant, even though the salesman had demonstrated a "unity of interest" with the corporation by regularly withdrawing funds from the corporation without following corporate formalities. More was required, however. As the trial court found, and the Supreme Court affirmed, the withdrawals were not the cause of the nonpayment of the aggrieved party's damage, and were not fraudulent or unjust on their face; indeed, the court accepted testimony that such withdrawals were "in lieu of salary." *Polaris,* 103 Nev. at 602, 747 P.2d at 887.

The court did not reach the same result with a brother of the salesman, who took many advances from the company to "support his gambling habit." *Polaris,* 103 Nev. at 603, 747 P.2d at 887. These ad-

vances, stated the court, were not supported by consideration and thus depleted the corporation's available cash, and thus the fact of these advances was a contributing cause to the nonpayment of the aggrieved party. In such circumstances, the court found the necessary injustice in the connection between the arbitrary and unprincipled use of corporate funds for personal use and the ultimate nonpayment of the aggrieved party. *Polaris,* 103 Nev. at 603, 747 P.2d at 888.

This theme of a necessary connection between the acts and knowledge of the alleged alter ego and the nonpayment of the aggrieved party continued in *Trident Const. Corp. v. West Elec., Inc.,* 105 Nev. 423, 776 P.2d 1239 (Nev.1989). In that case, a corporate officer had signed a settlement agreement without indicating his representative capacity. The unpaid creditor then sued the officer, alleging either a guaranty or alter ego liability. After citing to *Rowland v. Lepire* for the proposition that the aggrieved party has to plead and prove a link between the control exercised and the injustice caused, the court found no liability. As the court stated:

> we believe it is incumbent upon the one seeking to extend personal liability to an officer of a corporation for a corporate debt, to show by a preponderance of the evidence, that the officer intended to be personally bound, and that the creditor was looking to the officer as the guarantor of the debt.

*Trident Const. Corp.,* 105 Nev. at 428, 776 P.2d at 1242.

Here, of course, there was conflicting testimony as to Mr. Giampietro's intent as to the guaranty, but Mr. Giampietro's posi-

tion that he did not intend to guaranty the debt is more consistent with the fact that no guaranty was ever signed (while one was signed with respect to the landlord), and with his explanation regarding the use of a limited liability company to achieve the acquisition.

The theme of guaranties continued in *Paul Steelman, Ltd. v. Omni Realty Partners,* 110 Nev. 1223, 885 P.2d 549 (Nev.1994). There, a disappointed creditor claimed that the shareholders of its insolvent debtor should be liable for the corporate debts since the corporation was undercapitalized. Even assuming undercapitalization,[18] however, the court found that there was no injustice. The undercapitalization was caused by a desire to reap tax benefits, not deprive creditors of their just debts. The court also placed the blame on the aggrieved creditor, Steelman:

> Steelman alone is responsible for not protecting against the eventuality that occurred by insisting on individual guarantees from shareholders who were financially capable of satisfying its claims against LCHC.

*Paul Steelman, Ltd.,* 110 Nev. at 1226, 885 P.2d at 551. It almost goes without saying that AE was in the same position as Steelman. *See also Mosa v. Wilson–Bates Furniture Co.,* 94 Nev. 521, 524, 583 P.2d 453, 455 (Nev.1978) (liability found when alleged alter ego "had given personal assurances to the creditor that he would be personally liable . . . .").

The Nevada Supreme Court's next involvement with the alter ego doctrine had a different outcome. In *Lorenz v. Beltio, Ltd.,* 114 Nev. 795, 963 P.2d 488 (Nev.

---

**18.** The court, however, refused to find undercapitalization. As it stated, "[a]lthough LCHC was only capitalized with a $200 receivable, its real value was best measured by the collective expertise of its shareholders."

110 Nev. at 1225 n. 1, 885 P.2d at 550 n. 1. The parallel to Mr. Giampietro is obvious; part of his effective capitalization of Chianti Café was his expertise and experience of over twenty years in the restaurant business.

1998), a troubled motel operator had discussions about transferring the business to the Strubles. To complete the deal, the Strubles formed a corporation, had the operator assign the lease of the motel to the corporation, and then later caused the corporation to file a bankruptcy case. In finding alter ego liability in favor of the landlord on the lease, the court noted that the necessary control and influence existed through the manner in which the Strubles operated the business; they commingled funds, did not open up a bank account for the corporation, and generally did not follow corporate formalities. They capitalized the business with a note secured by property that was being foreclosed upon by another creditor.

Of more relevance here, however, is the court's treatment of the third requirement of *McCleary Cattle Co.* Fraud and injustice were present, said the court, because despite the bankruptcy of the corporation which had nominal title to the motel, the Strubles continued to operate it for their personal gain. And while no payments were ever made to the landlord, payments were made (or more accurately, caused to be made) by the corporation to the Strubles. The operation of the business for the benefit of the shareholders and to the detriment of the landlord was found to be an injustice justifying the imposition of alter ego liability.

Finally,[19] in *LFC Mktg. Group, Inc. v. Loomis,* 116 Nev. 896, 8 P.3d 841 (Nev. 2000), the Nevada Supreme Court sanctioned so-called "reverse" veil piercing—that is, where the subsidiary is held liable for the debts of a parent. In *LFC,* one Williams had been evading a $25,000 judgment for over three years. By not taking an ownership interest in a Nevada corporation, but by manipulating its ownership (through family members) and its contractual affairs so that he could obtain the benefit of its Nevada business income, the trial court found that he had intentionally devised a group of corporate relationships in a manner designed to frustrate his creditors. After finding the necessary unity of interest and control, the court took into account this evasion, and found the necessary injustice.[20]

These cases demonstrate the wisdom of Judge George's encapsulation of the third requirement of *McCleary Cattle Co.* By focusing on the justifiable reliance of consensual creditors, and the reasonable expectations of non-consensual creditors, the alter ego doctrine can be applied in a principled manner. This preserves the "essence" of the doctrine—that courts "do justice," *LFC Mktg. Group, Inc. v. Loomis,* 116 Nev. 896, 903, 8 P.3d 841, 845–46 (Nev.2000), while ensuring that "the corporate cloak is not lightly thrown aside," *Lorenz v. Beltio, Ltd.,* 114 Nev. 795, 807, 963 P.2d 488, 498 (Nev.1998). As a consequence, in this case whether AE has

**19.** The Nevada District Court has also decided a recent alter ego case under Nevada law. In *Mallard Auto. Group, Ltd. v. LeClair Mgmt. Corp.,* 153 F.Supp.2d 1211 (D.Nev.2001), the court was presented with a reverse alter ego claim. Although not deciding the issue, since the procedural context was summary judgment, the court noted that the person claimed to be an alter ego of a corporation had likely formed the corporation as part of a scheme to avoid paying taxes by transferring assets he owned to a corporation he controlled, and then standing on the different ownership in

resisting payment. "Allowing corporate formalities to shield this money ... would be a fraud and injustice on the taxpayers of the United States." 153 F.Supp.2d at 1216.

**20.** The owner of the stock of the nominal creditor was a brother of Williams, and the court affirmed a finding that the reverse veil piercing would not harm his legitimate interests. *LFC Mktg. Group,* 116 Nev. at 906, 8 P.3d. at 847.

shown that it meets the third requirement of *McCleary Cattle Co.*—that is, whether recognition of Chianti Café's separate existence would sanction fraud or promote injustice—resolves itself into an examination of the AE's reasonable expectations at the time the parties signed the Agreement.

On this score, AE's proof fails. AE negotiated a contract that it knew was to be signed only by Chianti Café, a limited liability company. It accepted this contract knowing that the landlord had requested—and would receive—a separately signed guaranty by Mr. Giampietro that was in addition to a formal assumption of the lease obligations by Chianti Café. The Agreement itself contains no requirement that Mr. Giampietro provide a guaranty at the closing of the transaction; indeed, Dr. Anes testified that the chief contingency was obtaining a liquor license. That the parties did not contemplate a separate guaranty is further shown by the fact that the Agreement contains an integration clause, raising at least the presumption that the Agreement contained all of the material closing conditions to the transaction.

Chianti Café, not Mr. Giampietro, then deposited a $20,000 cashier's check for the earnest money deposit into escrow, albeit it is true that Mr. Giampietro was the remitter for that check. Such informal contributions to capital are to be expected in the formation stages of a business, and Mr. Giampietro testified that he intended to document the formalities as soon as he had taken possession and opened up the business.[21] What matters here is not so much that Mr. Giampietro did not assiduously and contemporaneously document each act taken on behalf of Chianti Café—what matters is that AE did not rely upon, or even care about, the lack of formality. As Judge George put it in *In re Twin Lakes*, "courts see such sloppiness [with regard to corporate formalities] as inequitably rendering creditors prone to overlook a corporate formality to their eventual detriment. The controlling entity will therefore be estopped from denying that the faulty scenario they have drawn, or permitted to be drawn, is less than a legal reality when one of their creditors is injured by reliance upon such a portrayal." *In re Twin Lakes*, 2 B.R. at 542.[22]

At least at the time of the signing of the Agreement, it appears that AE was dealing with Chianti Café and Mr. Giampietro as two entities. This division continued throughout the sad coda to that signing. When the transaction fell apart, it was Chianti Café—not Mr. Giampietro—who sued to recover the $20,000 earnest money deposit. In response, AE counterclaimed against Chianti Café—not Mr. Giampietro. And it waited over a year before it even attempted to add Mr. Giampietro to the action.

These facts lead to the conclusion that, at all times relevant, AE treated Chianti Café as a separate legal individual. While they expected Mr. Giampietro to continue to run Chianti Café, they took no steps to

---

21. With respect to corporations, Nevada's Constitution explicitly protects a corporation's promoters from pre-formation debts. Article 8, Section 3 of the Nevada Constitution states that "corporators in corporations formed under the laws of this State shall not be individually liable for the debts or liabilities of such corporation."

22. Mr. Giampietro's testimony was to the effect that he kept records from which the expenditures and expenses could be documented at a later time when it was more reasonable to formalize the books of the fledgling business. And this he did; produced at trial was a copy of the cashier's check that was purchased for Chianti Café, as well as copies of drafts, and the signed copy, of the Agreement.

ensure that state of affairs (such as a clause in the Agreement that Mr. Giampietro would manage the restaurant, or that the agreement would be in default if Mr. Giampietro transferred his membership interest in Chianti Café to another person). In short, AE "received 'exactly what [it] bargained for,'" *Lipshie v. Tracy Inv. Co.,* 93 Nev. 370, 378, 566 P.2d 819, 824 (Nev. 1977), and thus the denial of recourse to Mr. Giampietro is not unjust.

## V.

### Conclusion

Because Chianti Café is not the alter ego of Mr. Giampietro, AE cannot establish itself as a creditor in Mr. Giampietro's bankruptcy case. As such, AE has no standing to bring this action for denial of Mr. Giampietro's discharge.

This opinion will constitute the court's findings of fact and conclusions of law under FED. R. BANKR. PRO. 7052; a separate order entering judgment for Mr. Giampietro and dismissing this case will be entered under FED. R. BANKR. PRO. 9021. Each side shall bear its own costs under FED. R. BANKR. PRO. 7054(b).